### In the MATTER OF G.B.

#### NO. 02-17-00055-CV

Court of Appeals of Texas, Fort Worth.

DELIVERED: July 6, 2017

ATTORNEY FOR APPELLANT: FRANK ADLER, FORT WORTH, TX.

ATTORNEY FOR APPELLEE: SHAREN WILSON, CRIM. DIST. ATTY., DEBRA WINDSOR, ASST. CRIM. DIST. ATTY., CHIEF, POST-CONVICTION, JOHN MESKUNAS, JIM HUDSON, RILEY SHAW, ASST. CRIM. DIST. ATTYS., FORT WORTH, TX.

PANEL: SUDDERTH, KERR, and PITTMAN, JJ.

## OPINION

BONNIE SUDDERTH, JUSTICE

### I. Introduction

Appellant G.B. was fourteen years old when he allegedly got high and participated in an aggravated robbery that resulted in the shooting death of Eusebio Bernardo-Fernando, known as Chevo. During the early morning hours of March 6, 2016, nineteen-year-old Antonio Segura entered Chevo's store and shot him in the back of the head. Segura then let G.B. and another nineteen-year-old, Fernando Marines, inside the store, and the trio then began to loot the place. Several months later, in August, the murder's lead investigator located G.B. while he was in custody and added capital murder to an unrelated burglary charge already pending against him.

In one issue, G.B. appeals the juvenile court's decision to transfer him to a district court to be tried as an adult in criminal proceedings for the capital murder. We affirm.

## II. Background

Unfortunately, the facts of this case are not uncommon. *See, e.g., Moon v. State*, 451 S.W.3d 28, 31–32 (Tex. Crim. App. 2014) (describing the disadvantaged upbringing and fractured family life of the sixteen-year-old juvenile appellant accused of murder); *Matthews v. State*, 513 S.W.3d 45, 51, 60 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (describing sixteen-year-old juvenile appellant, who had a criminal history showing escalating behavior from physical assault, thefts, and credit card abuse before he was accused of murdering his pregnant girlfriend); *Matter of C.M.M.*, 503 S.W.3d 692, 696, 703–04 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (describing fourteen-year-old juvenile appellant's unstable childhood involving poverty, foster care, and drug use before he was accused of murdering his pregnant mother).

Fort Worth Police Detective Matt Anderson, a certified peace officer for over seventeen years and the lead investigator on the case, and Chris Shahan, a supervisor with the Tarrant County Juvenile Probation Department, were the State's only witnesses at G.B.'s certification hearing. The rest of the State's evidence came from the evaluations ordered by the juvenile court, which contained information from G.B.'s grandmother and G.B. along with that of the professionals who evaluated G.B.'s mental and physical health.

### A. G.B.'s Background

G.B. and his family lived below the poverty level, his parents used drugs and spent time in and out of jail, and he and his brothers spent a year in foster care

after Child Protective Services found "reason to believe" neglectful supervision by his parents. G.B.'s maternal grandparents had conservatorship of G.B., who was placed with them due to his parents' drug and criminal history.[1] G.B.'s grandmother indicated that G.B.'s mother was an enabler who allowed G.B. to do as he pleased with no discipline. She reported that this had led G.B. to want to act like he was an adult who did not need to follow rules, abide by curfew, or go to school. G.B.'s grandfather had medical issues that put a strain on the household, and G.B. took advantage of his elderly grandparents.[2]

By the time G.B. was twelve he had already received his first referral to the Juvenile Probation department—for engaging in two counts of organized crime, one count of theft of property over $500, and criminal mischief over $500. With regard to that referral, in November 2014, G.B. was placed on deferred prosecution probation, but within three months he violated his probation conditions by failing to attend a drug abuse program.

Six months later and during the twelve months that followed, G.B. was tardy to school, skipped school, was suspended from school, was sent to in-school detention, saw his grades drop, and had gone to school under the influence of drugs. Although he acknowledged that his grandparents were often upset with him over his behaviors, G.B. did not consider his behaviors at school to be a problem. G.B. had a history of coming and going from his grandmother's home as he pleased, and by November 2015, he left his grandmother's home to live with friends. Around that time, G.B. also received a referral for pos-

---

1. G.B.'s older brother also had a history of drug abuse and was living with G.B.'s father at the time of G.B.'s juvenile court evaluation in this case, while G.B.'s younger brother had been arrested and then sent to live with extended family in San Antonio.

2. At the time of the transfer hearing, G.B.'s aunt was his guardian and managing conservator.

session of marijuana, less than two ounces. He failed to appear for his scheduled adjudication hearing, but on April 19, 2016—just over a month after Chevo's murder—he received community-based detention for this offense.

## B. The Murder and Initial Investigation

At 4:53 a.m. on March 6, 2016, a 911 caller reported that a possible burglary was in progress at a location he described as "Chevo's Tire Shop."[3] The patrol officers who arrived on the scene were met by the 911 caller, Eduardo Rivas, who flagged them down and directed them to the business premises. When the officers entered the building, they found[4] a large amount of blood, blood smears, bloody footprints, scattered property, and then, finally, Chevo's body. Chevo's face and torso were covered in blood, and although at first the responding officers were not certain if he had been shot, it was clear to them at that point that he was deceased. To the detectives who arrived approximately an hour and a half later, the blood pooling and smears indicated that either his body had been moved or that a second body had been present and moved. According to the officers, the place had been "ransacked"—at least one door had been kicked in, glass was broken, the store's DVR security system had been removed, and bullet casings had been left on the floor.

Rivas told police that at about 4:00 a.m., he had seen a man, or men, placing boxes inside Chevo's gold Honda parked in the parking lot. When the man saw Rivas, he approached him, pointed a handgun at

him, and asked him a question about Chevo. Rivas responded by "play[ing] dumb" and saying "I don't know what you're talking about." According to Rivas, he "stayed low" and waited for them to leave, and then he went to a nearby store and called 911.

The police obtained the license plate number to the Honda from Chevo's coworkers, and the vehicle was later found abandoned off Jacksboro Highway. In the meantime, due to the large amount of evidence at the crime scene, the police continued to investigate and collect evidence from the premises for three days.

## C. After the Murder

In April 2016, G.B.'s mother was released from an eleven-month court-ordered residential treatment program, and G.B. received a referral from the Fort Worth Police Department for possession of marijuana of less than two ounces in a drug free zone—possession of drugs at school—for which he received a supervisory caution. G.B.'s latent fingerprints were also found at the scene of an April 28, 2016 burglary.[5]

In the two months that followed, events escalated for G.B. In May, he was expelled from school after being found with a knife and syrup[6] in his possession at school. He had been staying in a hotel with a young girl who had been reported as a runaway. A directive to apprehend him was issued on May 25 for his violation of the conditions of his release, and he was referred in custody by the Fort Worth Police Department for two burglary-of-a-habitation of-

---

**3.** The 911 caller later revealed that, along with tires, Chevo also sold guns and drugs out of the shop.

**4.** Police were given consent to enter the business from its owner, Pedro Dejesus, who informed them that Chevo had lived and worked in the shop.

**5.** At the time of the transfer hearing, Detective Anderson did not know if G.B. had been charged with that offense yet.

**6.** The record indicates that G.B. possessed "syrup" at school. Whether this was cough syrup or something different is unclear.

fenses and failure to identify. During that investigation, the police discovered that G.B. had lied about his age and that there was a pending warrant for his arrest.

In June, a first amended delinquency petition was filed against G.B. for possession of marijuana and burglary of a habitation, and he was placed on an electronic ankle monitor. Then, based on information from an Irving Police Department narcotics confidential informant, Detective Anderson located the murder weapon, which led him to Segura—the gun's owner—and Segura's friends, one of whom, Ruben Gonzalez, identified G.B. as one of the parties responsible for Chevo's death.

According to Gonzalez, the day before Chevo was killed, Segura told Gonzalez that he and G.B. were going to go to Chevo's shop to get some cocaine. Gonzalez said that prior to the shooting, Segura had already told him that he planned to rob Chevo, and then afterwards Segura admitted that they had killed him. Segura also admitted that they had removed and disposed of the security camera system and that they also stole stereos, guns, and approximately $5,000 before they "clean[ed] everything up." Using G.B.'s name and the Twitter handle that had been provided to him by Gonzalez, Detective Anderson located a photo of G.B. holding an AK-47. Gonzalez identified G.B. from the photo.

Detective Anderson interviewed Segura, who admitted that he had shot Chevo and that the murder weapon was his. Segura told the detective that after he shot Chevo, he let G.B. inside. He described G.B. as "happy" as he stepped on Chevo's body, approached a grandfather clock, and began gathering money that was hidden inside.[7] According to Segura, G.B. and Marines made at least three trips into and out of the building to take money, cocaine, watches, cologne, car stereos, car batteries, tires, a DVR system, and guns, and at least one of those trips was for the purpose of removing fingerprints from glass and other surfaces they had touched while there. In the process, they loaded Chevo's Honda with items taken from the store, and when the looting spree was complete, G.B. and Marines drove it from the scene. As for the cash, Segura told the detective that he and G.B. used $1,050 as a deposit on a new apartment and then invested $2,700 on a pound of marijuana. Most of the stolen goods were eventually sold "on the street,"[8] and the vehicle was abandoned at a gas well site. The DVR security camera system was destroyed.

On the same day that he interviewed Segura, Detective Anderson also interviewed Alex Ramirez, who had destroyed the store's DVR for the three men. While Segura had denied having planned to rob Chevo, Ramirez told the detective that prior to the murder he had heard Segura and G.B. talking about robbing Chevo.

Detective Anderson's next step was to contact G.B.'s family. G.B.'s brother D.B. told the detective that G.B. told him that he had gone to the tire shop to look for a job the day Chevo's body was found and that when he discovered Chevo's body, he went "through his pockets and [had] taken some stuff." D.B. said that three months after the murder, G.B. "told him he was waiting outside in the all[e]y when he heard ... the gunshots and went inside to find [Segura] and" Chevo. D.B. told Detective Anderson that G.B. told him that Segura killed Chevo and that G.B. had acquired approximately $800 the day Chevo

---

7. According to Segura, G.B. knew that Chevo hid his cash in the clock because he had worked for Chevo in the past.

8. One of Segura's associates, Luis Espinoza, also confirmed to the detective that he had seen G.B. selling a lot of the items from the robbery "on the street."

was killed. D.B. also told him that G.B. had worked for Chevo off and on and that G.B. had initially stolen a phone from the premises but had quickly rid himself of it because he did not want the police to be able to use it to track him down.

Marines, the other participant in the robbery, told Detective Anderson that prior to the shooting, Segura had talked about how he needed money to "pay off a dope loan." According to Marines, that evening he and G.B. waited in the alley until they heard a loud pop. After three to five minutes, they heard the sound, and G.B. "got excited and ran to the shop." But Marines stayed in the alley until Segura came out and handed him two bags of cocaine. He continued to stay outside until Segura returned again, at which time, according to Marines, Segura told him that things had gone "bad" and that he had shot Chevo. Marines said that before they went to the shop that night, Segura said that Chevo was going to either give them the cocaine "for a decent amount or [that he was] just going to take it from him."

During the time that Detective Anderson conducted these interviews, G.B. cut off his electronic ankle monitor and ran away from home. He was gone for a month before he was detained on August 4, 2016, on a directive to apprehend issued after he removed the monitor. G.B. said that he cut off the monitor so that he could attend a concert in Dallas. After G.B. was taken into custody in August for burglary, Detective Anderson added the instant capital murder charge.

## D. Procedural Background

On September 13, 2016, the State filed a petition requesting that the juvenile court waive its jurisdiction and transfer G.B. to the district court to be tried as an adult for violating penal code section 19.03(a)(2).[9] *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2016) (defining capital murder as intentionally committing the murder in the course of, among other offenses, committing or attempting to commit a burglary or robbery); Tex. Fam. Code Ann. § 54.02 (West 2014). The juvenile court issued an order for a diagnostic study, social evaluation, and full investigation of G.B., his circumstances, and the circumstances surrounding the alleged offense. *See* Tex. Fam. Code Ann. § 54.02(d).

As of September 2016, G.B. was assessed with a high risk of re-offending criminally. During the assessment process, G.B. had reported using marijuana, alcohol, and Xanax, primarily at parties on the weekend, and he had admitted to past behavioral problems in school related to skipping, being disrespectful, and being disruptive. The substance abuse assessment on G.B. was completed in October 2016, and it recommended intensive residential treatment. In December 2016, G.B. was released to his aunt and grandmother on an electronic ankle monitor conditioned at least in part on no access to social media. In the meantime, Detective Anderson had obtained a search warrant for G.B.'s DNA. At the time the warrant was executed, G.B. volunteered to the detective that his attorney was trying to get the charge dropped to aggravated robbery because G.B. did not enter the building until after the shot was fired.

At the February 2017 certification hearing, Shahan, who worked in the placement unit of the Tarrant County Juvenile Probation Department, testified that he supervised adolescents who had been court-

9. In paragraph III of its petition, the State alleged that on or about March 5, 2016, G.B. "did intentionally cause the death of Eusebio Bernardo-Fernando by shooting him with a firearm, and [G.B.] was in the course of committing or attempting to commit the offense of robbery."

ordered into residential treatment. He conducted a placement search for G.B. but was unable to locate a secure private facility that was willing to accept him. Shahan was able to locate an unsecure placement, but the only facility willing to accept him—Glen Mills school in Concordville, Pennsylvania—was unable to meet G.B.'s need for psychotherapy.

After the State rested, G.B. presented evidence from Michael Flores, a licensed professional counselor at Brighter Possibilities Family Counseling, which offered in-home family counseling if there was a mental health component but did not require a mental health component for office treatment. He testified that Brighter Possibilities could offer outpatient drug treatment for those trying to stop drug use, but if addiction was an issue, it would make a referral to a treatment facility.

G.B. also presented the testimony of Frank Minikon, the court intake supervisor for Juvenile Services. Minikon had stepped in for G.B.'s regular probation officer, Maria Rojas, who was on leave. Minikon testified that G.B. was living at home with his aunt and was on an electronic ankle monitor. He was enrolled at JJAEP, an alternative school for juvenile justice, and attended counseling every Tuesday. Minikon stated that there had been no reported issues while G.B. was out on the monitor.

The evaluation reflected an opinion that G.B.'s risk for dangerousness was low because there was insufficient evidence that he had actively engaged in physical violence toward others. His sophistication rating was "in the high range," but according to the report, this was "attributable to his sophistication rather than his emotional maturity." His amenability to treatment was low because his established history

and his interview both supported an inference that he did not perceive himself to have any mental health or drug abuse problems and he was thereby unmotivated to engage in services available to treat them. The licensed psychologist who performed the diagnosis stated, "It is unclear how successful [G.B.] would be in detaching from older individuals or those who are in a criminal [lifestyle], with whom he has engaged in prior criminal activity." [10]

G.B.'s psychological evaluation reflected that his overall intellectual functioning was within the below average range and his scores allowed for the inference that his cognitive reasoning abilities were less developed than those not requiring verbal reasoning or those needed for memory of verbal and pictorial stimuli. His academic ability scores were within the average range. His evaluation also reflected a propensity for being an immature conformist, i.e., "one who may conform to the mores of whatever group they value or associate with in order to be accepted." It also reflected "one who is likely to be self-satisfied, prone to manipulation, and is at risk to engage in property crimes."

Additional assessment of G.B. reflected that he had admitted committing illegal activities for profit and spent time in risky social settings that at times involved firearms. He also reported using Xanax, marijuana, and alcohol heavily three to four times a week for around two years, although he denied any Xanax use since March 5, 2016. He admitted using marijuana and alcohol heavily prior to his detention on August 4, 2016, and admitted that he had used Xanax and alcohol to the point of "losing control" and experiencing "blackouts." The assessment recommended intensive residential substance abuse treatment for G.B. and a more structured living environment where G.B. could learn drug

10. G.B. associated with older males for the prestige it gave him with his peers, allowing

him to attend parties that others his age could not.

refusal skills, peer-pressure refusal skills, and other important coping skills.

G.B.'s maternal aunt was willing to have G.B. live with her because his grandparents were concerned that they could no longer take care of him.

Tarrant County Juvenile Services reported that based on the severity of G.B.'s current alleged offenses, his criminal history, the risk he presented to the community, and his lack of motivation for change, G.B. needed a more secure and structured setting than Juvenile Services had available. It was also reported that G.B. admired or emulated his anti-social peers, that he was hyper, excited, or stimulated when committing crimes, and that he rarely resisted going along with anti-social peers. However, his evaluation also listed that he accepted responsibility for his anti-social behavior, believed he could change, had empathy for his victims, and understood there were consequences to his actions and that he was not physically violent or aggressive.

The juvenile court granted the State's petition.[11] In the written order, the juvenile court made the following findings of fact:

- The alleged offense is both a capital felony and a first-degree felony if committed by an adult and was committed against the person of another;
- There is probable cause to believe that G.B. committed the offense;
- G.B. is of sufficient sophistication and maturity to be tried as an adult;
- The likelihood of G.B.'s reasonable rehabilitation by the use of procedures, services, and facilities currently available to the juvenile court is low and, after considering all the testimony, diagnostic study, social evaluation, and full

investigation, it is contrary to the best interests of the public to retain jurisdiction;

- Because of the seriousness of the alleged offense and G.B.'s background, the welfare of the community requires criminal proceedings;
- In making this determination, the juvenile court considered the details above and among other matters:
  (1) Whether the alleged offenses were against person or property, with the greater weight in favor of the offense against the person;
  (2) The sophistication and maturity of the child;
  (3) The record and previous history of the child; and
  (4) The prospects of adequate protection of the public and the likelihood of reasonable rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

The juvenile court stated that it based its findings

on evidence presented by the State in support of its motion; specifically, that prior to the act alleged in Paragraph III of the Petition, [G.B.] received a referral for Engaging in Organized Crime/Theft of Property/Criminal Mischief for which [G.B.] received supervision and services from Tarrant County Juvenile Services ... and Possession of Marihuana Under Two Ounces, and, that after the act alleged in Paragraph III of the Petition, [G.B.] received referrals for Possession of Marihuana Under Two Ounces, Failure to Identify to a Peace Officer, and multiple accusations of Burglary of a Habitation, and, that [G.B.] previously violated the Court's conditions

---

11. At the hearing, the juvenile court admitted into evidence a copy of the pre-diagnostic study and psychological evaluation of G.B.

The trial court considered this evaluation along with testimonial evidence presented at the hearing.

of release by cutting off his electronic monitor.

The Court also bases its findings on evidence presented by the State in support of its motion regarding [G.B.'s] actions and conduct as a principal or a party in the commission of the act alleged in Paragraph III of the Petition; specifically, the heinous nature of these actions and conduct, the manner in which they were allegedly committed by [G.B.], and [G.B.'s] alleged conduct of covering up the offense and evading detention by law enforcement.

This appeal followed.

## III. Applicable Law and Standard of Review

As pertains to the case before us, to waive its jurisdiction and transfer G.B. to be tried as an adult, the juvenile court had to find that G.B. was alleged to have committed a felony, that he was fourteen years old or older at the time he committed the alleged offense (a capital felony for which no adjudication hearing has been conducted), that—after a full investigation and a hearing—there was probable cause to believe that G.B. committed the alleged offense, and that the welfare of the community requires criminal proceedings because of the alleged offense's seriousness or G.B.'s background.[12] See Tex. Fam. Code Ann. § 54.02(a)(1)–(3).

■ In making the determination required in subsection (a), the juvenile court

had to consider, among other matters: (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (2) G.B.'s sophistication and maturity; (3) G.B.'s record and previous history; and (4) the prospects of adequate protection of the public and the likelihood of G.B.'s rehabilitation by use of procedures, services, and facilities currently available to the juvenile court. See id. § 54.02(f). These are nonexclusive factors that serve to facilitate the juvenile court's balancing of the potential danger to the public posed by the particular juvenile offender with his or her amenability to treatment. Moon, 451 S.W.3d at 38 (citing Hidalgo v. State, 983 S.W.2d 746, 754 (Tex. Crim. App. 1999)). Family code section 54.02(h) requires that if the juvenile court waives jurisdiction, "it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court." Tex. Fam. Code Ann. § 54.02(h); Moon, 451 S.W.3d at 38.

■ With regard to our review of that order, our court of criminal appeals has instructed us as follows:

[I]n evaluating a juvenile court's decision to waive its jurisdiction, an appellate court should first review the juvenile court's specific findings of fact regarding the Section 54.02(f) factors under "traditional sufficiency of the evidence review."[13] But it should

---

12. It is undisputed that G.B. was alleged to have committed a felony, that he was fourteen years old or older at the time that he committed the alleged offense, and that there was probable cause to believe that G.B. committed the alleged offense as a party, if not a principal.

13. That is, because juvenile cases are reviewed under the civil standards of review for legal and factual sufficiency, and because the

State's burden is the preponderance of the evidence, see Moon, 451 S.W.3d at 35, 40, 46, we may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. Ford

then review the juvenile court's ultimate waiver decision under an abuse of discretion standard. That is to say, in deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged and/or the background of the juvenile called for criminal proceedings for the welfare of the community, the appellate court should simply ask, in light of its own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. In other words, was its transfer decision essentially arbitrary, given the evidence upon which it was based, or did it represent a reasonably principled application of the legislative criteria? And, of course, reviewing courts should bear in mind that not every Section 54.02(f) factor must weigh in favor of transfer to justify the juvenile court's discretionary decision to waive its jurisdiction.

*Moon,* 451 S.W.3d at 47. Further,

a reviewing court should measure sufficiency of the evidence to support the juvenile court's stated reasons for transfer by considering the sufficiency of the evidence to support the facts as they are expressly found by the juvenile court in its certified order. The appellate court should *not* be made to rummage through the record for facts that the juvenile court *might* have found, given the evidence developed at the transfer hearing, but did not include in its written transfer order. We therefore hold that, in conducting a review of the sufficiency of the evidence to establish the facts relevant to the Section 54.02(f) factors and any other relevant historical facts, which are meant to inform the juvenile court's discretion whether the seriousness of the offense alleged or the background of the juvenile warrants transfer for the welfare of the community, the appellate court must limit its sufficiency review to the facts that the juvenile court expressly relied upon, as required to be explicitly set out in the juvenile transfer order under Section 54.02(h).

*Id.* at 49–50.

### IV. Discussion

Because both G.B. and the State rely on *Moon,* we will review this case before applying the standards set out by the court of criminal appeals.

### A. *Moon v. State*

In *Moon,* the court of criminal appeals reviewed whether the intermediate appel-

---

Motor Co. v. Castillo, 444 S.W.3d 616, 620 (Tex. 2014); *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas,* 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex. 1996).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965).

late court had conducted an appropriate review of a transfer order for a juvenile accused of first degree murder. 451 S.W.3d at 31, 34. The State called as its single witness the police officer who had investigated the alleged murder and then introduced evidence of the juvenile's previous referral for criminal mischief between $500 and $1,499.99 resulting from the juvenile's keying of a fellow student's vehicle, the juvenile's probation certification report and his academic history while under observation in the juvenile justice system, and the findings of the juvenile's physical—but not psychological or behavioral—exam. *Id.* at 32. In contrast, the juvenile elicited testimony from witnesses—various family members, friends, and acquaintances—about his disadvantaged upbringing and fractured family life, and actors in the juvenile justice system testified about his constructive conduct and positive progression through the system along with the recommendation of a forensic psychiatrist about his likelihood of rehabilitation if placed in a therapeutic environment for adolescent offenders. *Id.* at 32–33.

The juvenile court entered a written order that closely followed the statutory language, affirming that it had determined that there was probable cause to believe that the juvenile committed the alleged offense and that because of the offense's seriousness, the welfare of the community required a criminal proceeding. *Id.* at 33. It then recited from the statute that in making the determination, it had considered, "among other matters," the subsection (f) factors. *Id.*

The juvenile court also found in its written order that the juvenile was "of sufficient sophistication and maturity to have intelligently, knowingly and voluntarily waived all constitutional rights" and to have aided in the preparation of his defense and to be responsible for his conduct; that the alleged offense was against the person of another; and that there was little, if any, prospect of adequate protection of the public and likelihood of reasonable rehabilitation of the juvenile "by use of procedures, services, and facilities currently available to the Juvenile Court." *Id.*

On appeal, the juvenile complained that the stated reasons for waiver were supported by insufficient evidence and that the juvenile court had therefore abused its discretion. *Id.* at 34. The intermediate court agreed, concluding that no evidence supported the juvenile court's sophistication-and-maturity finding, as it was based on his ability to waive his rights and assist in his defense and not an appreciation of the nature of his actions, and that the evidence was factually insufficient to support its adequate-protection-and-likelihood-of-rehabilitation finding, as it was based on a sole misdemeanor conviction for keying a car and four infractions while confined in a juvenile facility, which was legally sufficient but not factually sufficient in comparison to the rest of the evidence presented at the hearing. *Id.* at 34–35. The intermediate court also concluded that the fact that the offense constituted a crime against another person, without more, was inadequate justification for a transfer because, otherwise, transfer would be automatically authorized for serious crimes like murder, rendering the remaining factors under subsection (f) superfluous. *Id.* at 35–36.

After reviewing the evolution of the law applicable to juvenile transfer cases, the court of criminal appeals agreed that legal and factual sufficiency of the evidence under the standard applicable to civil cases should apply to the juvenile court's specific findings of fact regarding the subsection (f) factors. *See id.* at 36–46, 47. But it further stated that a sufficiency review should not be applied to the ultimate question as to whether the seriousness of the

offense alleged or the child's background required criminal proceedings for the welfare of the community because this was a question left to the juvenile court's discretion based on those fact findings. *Id.* at 46–47 (explaining that "[t]he discretion of the juvenile court is at its apex when it makes this largely normative judgment").

The court further explained that in conducting this review, appellate courts should follow the approach as outlined by the El Paso Court of Appeals in *In re J.R.C.S.*:

> We apply a two-pronged analysis to determine an abuse of discretion: (1) did the [juvenile] court have sufficient information upon which to exercise its discretion; and (2) did the [juvenile] court err in its application of discretion? A traditional sufficiency of the evidence review helps answer the first question, and we look to whether the [juvenile] court acted without reference to any guiding rules or principles to answer the second.

*Id.* at 47 (quoting *In re J.R.C.S.*, 393 S.W.3d 903, 914 (Tex. App.—El Paso 2012, no pet.)).

The court then noted the distinction between (1) a finding that the offense alleged to have been committed had occurred, as substantiated by evidence at the transfer hearing showing its sufficiently egregious character, which would support the transfer, and (2) a finding that the mere category of the alleged offense is sufficient, which would not support the transfer. *Id.* at 48 (explaining that if the only consideration informing the decision to waive jurisdiction is the category of the crime rather than its specifics, then the transfer decision "would almost certainly be too ill-informed to constitute anything but an arbitrary decision"). And it required measuring the sufficiency of the evidence to support the explicit facts expressly found by the juvenile court in the written transfer order instead of "rummag[ing] through the

record for facts that the juvenile court *might* have found" but that it did not include in its written transfer order. *Id.* at 50.

Because the transfer order in *Moon* made no findings about the specifics of the capital murder other than (1) that there was probable cause to believe that the juvenile had committed "the offense alleged"; (2) that the offense's seriousness required criminal proceedings for the welfare of the community; and (3) that the offense alleged was committed against the person of another, the court upheld the intermediate court's conclusion that the juvenile court had abused its discretion in granting the transfer. *Id.* at 48–50. And because the juvenile court did not cite the juvenile's background as a reason in the written order for the transfer, its sophistication-and-maturity finding of fact—which the court of criminal appeals agreed was unsupported by legally sufficient evidence—and its protection-and-rehabilitation finding of fact were superfluous. *Id.* at 50–51. The court of criminal appeals affirmed the intermediate court's reversal of the transfer order, restating that with no case-specific findings of fact as to the offense's seriousness, the evidence failed to support that reason as a basis for the transfer. *Id.* at 51.

## B. Application

Relying on *Moon*, G.B. argues that we should examine whether the trial court's transfer decision was essentially arbitrary given the evidence upon which it was based and that the juvenile court did not "'show its work' in the transfer order" by failing to specify any facts to justify its decision to waive its jurisdiction. The State disagrees, responding that the transfer order contains sufficient facts specific to G.B.'s case to support the juvenile court's findings and that G.B.'s reliance on *Moon*

is misplaced because unlike the single, vague finding in *Moon*, the juvenile court here made several findings that were specific to G.B.

In the transfer order before us, the juvenile court found that the alleged offense was a capital and first-degree felony and was committed against the person of another; that there was probable cause to believe that G.B. had committed the offense; that G.B. was of sufficient sophistication and maturity to be tried as an adult; that the likelihood of his reasonable rehabilitation by using procedures, services, and facilities currently available to the juvenile court was low; that—after considering all of the testimony, the diagnostic study, the social evaluation, and the full investigation—it was therefore contrary to the public's best interests to retain jurisdiction; and that because of the seriousness of the alleged offense and G.B.'s background, the welfare of the community required criminal proceedings.

The juvenile court stated in the order that it based these findings on the State's evidence, specifically, G.B.'s pre-offense referrals for engaging in organized crime, theft, criminal mischief, and possession of marijuana under two ounces, which he had received supervision and services from Tarrant County Juvenile Services for some of these offenses, and G.B.'s post-offense referrals for possession of marijuana, failure to identify, and multiple accusations of burglary of a habitation, in addition to his having previously violated his conditions of release by cutting off his electronic ankle monitor. And it stated in its transfer order that it also based its findings on evidence presented by the State regarding G.B.'s actions and conduct as a principal or party

to the commission of the offense, "specifically, the heinous nature of these actions and conduct, the manner in which they were allegedly committed by [G.B.], and [G.B.'s] alleged conduct of covering up the offense and evading detention by law enforcement."

As guided by the court of criminal appeals in *Moon*, we first review the legal and factual sufficiency of the evidence to support the juvenile court's findings of fact on the subsection (f) factors. *See* 451 S.W.3d at 46–47.

## 1. The Alleged Offense

■ G.B. contends that as to his alleged actions in Paragraph II [14] of the State's petition, the juvenile court made no case specific findings of fact. But the court referenced evidence presented by the State with regard to G.B.'s actions and conduct during the murder and made a specific finding that G.B.'s actions and conduct were of a "heinous nature." The court also specifically referenced G.B.'s conduct in allegedly covering up the offense and evading detention, all of which is supported by Detective Anderson's testimony.

The record provides ample evidentiary support for these findings. The State presented evidence about the investigation of the offense and the considerable lag time involved in locating G.B. without his electronic ankle monitor. The evidence showed that G.B. allegedly accompanied Segura and Marines to the tire shop of his former employer for an illegal purpose—alternatively to buy some cocaine or to commit a robbery—and that G.B. waited outside with Marines until he heard a pop—which was Segura's shooting of Chevo in the

---

14. Because Paragraph II of the State's petition references the name and residence of G.B.'s guardians and their address, we infer that G.B. intended to reference Paragraph III, which alleges that on or about March 5, 2016,

G.B. intentionally caused Eusebio Bernardo-Fernando's death by shooting him with a firearm while in the course of committing or attempting to commit robbery.

back of the head. G.B. was described as "excited" when he heard the pop and "happy" when he entered the building. According to Segura, G.B. then stepped onto Chevo's body en route to the grandfather clock where he removed the cash that was hidden there.

G.B. then made several trips to and from the building to steal money, drugs, watches, car stereos, tires, and other items—including Chevo's own vehicle—all the while tracking Chevo's blood throughout the store. According to G.B.'s brother, G.B. rifled through Chevo's pockets while Chevo lay dead or dying at the scene. During the crime spree, under these grisly circumstances, he managed to remain sufficiently focused and cool-headed to successfully remove all of their fingerprints. The DVR security video that would have evidenced the murder was destroyed, as was the phone that G.B. stole and then disposed of so that it could not be used to find him. Later he used the ill-gotten gains to buy more drugs.

Based on the above, we conclude that there is both legally and factually sufficient evidence to support the trial court's findings that G.B. was a principal or party to the offense and that his alleged actions and conduct were indeed heinous.

## 2. Sophistication and Maturity

■ G.B. argues that the juvenile court did not cite any facts to support its finding that he is of sufficient sophistication and maturity to be tried as an adult. However, as referenced by the juvenile court with regard to G.B.'s criminal referrals prior to and after the murder, the record reflects that G.B. had received his first referral for organized crime, theft of property, and criminal mischief two years before, when he was only twelve years old. He was put on deferred prosecution probation, which he violated by refusing to attend a drug abuse program, by using drugs, by receiving an additional referral for possession of marijuana, and by cutting off his electronic ankle monitor. That is, he was given the opportunity to rehabilitate with the services available to him but instead of using that opportunity, he chose to escalate his criminal behaviors and demonstrate indifference to his conduct and its potential consequences. At the time of the hearing, he faced more than one accusation of burglary of a habitation, and his fingerprints had been found at the scene of one of those burglaries.

The trial court likewise considered G.B.'s behavior in the commission of the murder in determining whether he was sophisticated and mature enough to stand trial as an adult.

Additionally, G.B. demonstrated his sophistication and maturity when he explained to the detective the possibility that his charge might be dropped to aggravated robbery because he did not enter the building until after the shot was fired. And the record affirmatively demonstrates that the trial court gave particular consideration to the question of G.B.'s sophistication and maturity, stating in open court:

Sophistication and maturity, that's a tough one. You're 15 now, 14 at the time. For someone though at the time who was 14 you already had a couple years of trouble with the law. I'm going to have to decide whether that amounts to maturity or immaturity. I also understand that you've been through supervision. It was deferred prosecution but it was still supervision. So again that's one of the issues I've got to satisfy in my own mind is whether—how sophisticated I feel like you are compared to most 14 or even 15 year[ ] old[s]. The offense is particularly disturbing. The allegations of how it was committed, the length of time it took to commit the offense, all the activities around it concerning the property and destruction of evidence and such. Very

complicated offense. But this is not your first rodeo so to speak. This is not your first time being involved in criminal activity. If it had been, it may make this case a little bit easier to decide. It's just made it harder to decide at this point.

In light of G.B.'s behavior after the murder—stealing merchandise and reselling it on the street and getting rid of Chevo's phone to avoid being tracked—the trial court could have determined that there was sufficient evidence to support the likelihood that G.B. deliberately chose to continue his criminal activities after the murder, to profit from them, and to avoid punishment and that these decisions were more sophisticated and mature than the decisions made by most fourteen-year-old children. We conclude that there is legally and factually sufficient evidence to support the trial court's finding that G.B. was sufficiently sophisticated and mature to stand trial as an adult.

### 3. Record and Previous History

■ As set out above, G.B.'s record and previous history—as recited by the trial court in its written order—revealed an escalation of criminal behavior. G.B. contends that the order addressed in a single paragraph G.B.'s previous referrals without citing any facts about whether he had been adjudicated on them, but the order references his having "received supervision and services from Tarrant County Juvenile Services" and that his "conditions of release" were violated when he cut off his ankle monitor. We conclude that these references are amply sufficient because they are adequately supported by the record and directly pertain to G.B.'s actions.

### 4. Protection of the Public and Likelihood of Rehabilitation

■ G.B. complains that the juvenile court did not elaborate or indicate any facts to support its findings that the likelihood of G.B.'s reasonable rehabilitation was low based on resources currently available to the juvenile court and that retaining jurisdiction is contrary to the public's best interest. But as set out above, G.B.'s continued escalation of criminal behavior and his callous disregard for Chevo, whom he had worked for, after Segura shot him support the trial court's finding that the public could not be adequately protected, particularly in light of G.B.'s having cut off his electronic ankle monitor when he had an earlier chance at rehabilitation for a significantly less severe offense. Because there is more than a scintilla of evidence that the public would not be adequately protected from G.B.'s future conduct and that G.B. was unlikely to be rehabilitated by the juvenile justice system, we conclude that the evidence is legally sufficient to support the trial court's finding. Likewise, based on all of the evidence, particularly Shahan's testimony that there was no secure private facility willing to accept G.B. and the information in G.B.'s evaluation about his frequency of leaving home, we conclude that the evidence is also factually sufficient to support that transferring G.B. to be tried as an adult would adequately protect the public from his future conduct, particularly in light of G.B.'s prior experiences involving rehabilitation—and his lack thereof—through the juvenile justice system's resources.

### 5. Decision to Transfer

Based on the above, we agree with the State that the written transfer order contains sufficient facts specific to G.B.'s case to support the juvenile court's findings. After considering the testimony and the twenty-six-page document containing all of G.B.'s evaluations, the trial court granted the motion to transfer. In light of the trial court's explicit findings and our own review of the record, which supports those findings, we conclude that the juvenile

court did not abuse its discretion by waiving jurisdiction and transferring G.B. for trial as an adult. We overrule G.B.'s sole issue.

### V. Conclusion

Having overruled G.B.'s sole issue, we affirm the juvenile court's transfer order.