

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-17-00468-CV

IN THE MATTER OF J.R.

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-106076-17

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an interlocutory appeal from a juvenile court's order waiving jurisdiction and transferring Appellant J.R. to criminal district court. *See* Tex. Fam. Code Ann. § 56.01(c)(1)(A), (h) (West Supp. 2017) (providing for appeal from an order entered under section 54.02 and stating that appeal of an order waiving jurisdiction under section 54.02 "has precedence over all other cases").

---

[1]*See* Tex. R. App. P. 47.4.

In a single issue, Appellant argues that the juvenile court abused its discretion by waiving jurisdiction because the evidence demonstrated that the Texas Juvenile Justice Department (TJJD) would provide sufficient safeguards for the public and "a very high probability of rehabilitation for [him]." Because the evidence demonstrates that, due to Appellant's age, he would not be able to complete the minimum confinement in TJJD necessary for rehabilitation and thus that Appellant's placement in TJJD would not adequately protect the public, we hold that the juvenile court did not abuse its discretion by waiving jurisdiction and will therefore affirm.

## II. Factual and Procedural Background

### A. Overview

Fourteen-year-old Kara[2] went missing from Bedford on the evening of June 19, 2017, and her body was found in an Arlington landfill two days later. After several months of investigation, police connected sixteen-year-old Appellant with Kara's death and charged him with committing multiple felony offenses, including murder, serious bodily injury, tampering with evidence of a human corpse, and tampering with physical evidence.

Due to the seriousness of the offenses, Appellant's background, and the welfare of the community, the State filed a petition requesting the juvenile court

---

[2]We use pseudonyms throughout the opinion to refer to the victim, who was a minor, and to refer to each of the witnesses. *See* Tex. R. App. P. 9.8(c)(2).

to waive its exclusive jurisdiction and to transfer Appellant to criminal district court. The State also requested the juvenile court to order "a complete diagnostic study, social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offenses." The juvenile court granted the State's request for a complete diagnostic study, and after preparation of the study, a hearing was held on the State's petition.

## B. Testimony at the Certification Hearing

### 1. The Investigation

Detective Anthony Shelley with the Bedford Police Department testified that he served as the lead detective in the investigation of Kara's death. On June 19, 2017, at approximately 8:15 p.m., officers responded to a call from Kara's mother, who reported that Kara was missing and was presumed to have run away. Kara's mother told officers that Kara had left their apartment at 6:20 p.m. to walk the dog and had not returned. Kara's mother found the dog tied to a fence at the apartment complex's dog park.

Officers learned that Kara's Instagram account contained messages about drugs from a boy named Kevin and questioned him that evening. Kevin told officers that he had met with Kara, that she had handed him the dog's leash, and that she had told him she would return. Kevin waited a short time for Kara to return, and when she did not reappear, he tied the dog's leash to the fence and went home.

3

The following day, officers interviewed Kevin a second time. Kevin said that he and Kara were supposed to meet with a male, who was later identified as Appellant, to conduct a drug transaction. Kevin told officers that he possibly knew where the marijuana exchange was supposed to have taken place, walked the officers to the area, and pointed to an apartment, which was located a few buildings over from the apartment where Kara lived. Kevin said that he and Kara were supposed to make $300 selling dabs[3] to Appellant.

Detective Shelley received information that Appellant was staying with his uncle Trent[4] in Fort Worth and went there to speak to Appellant. Detective Shelley explained that they were looking for Kara and asked Appellant if she was inside Trent's residence; Appellant said she was not. Appellant said that on June 19, he and Kara had planned to meet at the dog park at the apartment complex where she lived. Appellant said that he saw Kara's dog but that she was not there, so he went back to his girlfriend Jane's apartment, which was located at the same apartment complex. Appellant said that Trent picked him up at 6:00

---

[3]Detective Shelley explained that dabs is a liquid form of marijuana in an oil base that is made by melting marijuana into a concentrated form to obtain the THC from it.

[4]It was later revealed that the man Appellant referred to as his uncle was a family friend who was not related to Appellant.

4

p.m. that evening.[5]  Detective Shelley asked Appellant to elaborate, but Appellant said he did not have additional information and concluded the interview.

The following day, on June 21, 2017, the Arlington Police Department alerted the Bedford Police Department that they had located a body in the landfill. The Tarrant County Medical Examiner's Office ultimately identified the body as Kara's and found that the manner of her death was homicidal violence.  Detective Shelley testified that they investigated how Kara's body had arrived at the landfill and discovered from the sanitation department's route sheet that the location in the landfill where Kara's body was found corresponded to the route that picked up trash from the apartment complex where Kara had lived.

On June 23, 2017, police interviewed Kevin a third time, and he provided more details than in his prior interviews.  Kevin said that on June 19, he woke up around noon or 1:00 p.m. and received an Instagram message from Kara inviting him to her apartment.  Kevin went to Kara's apartment, and they watched a YouTube video on how to make dabs.  Kara received an Instagram message from Appellant telling her to come alone and to meet him at a bench near the swimming pool at the apartment complex.

Kevin followed Kara to her meeting with Appellant.  When Kevin peeked around the corner of a building, he saw Kara and Appellant standing together.

---

[5]Trent told police that he had picked up Appellant from Jane's apartment on June 19 between 7:24 p.m. and 7:28 p.m.

Moments later, Kara ran away. Kevin caught up with Kara, walked her home, and then returned to his apartment.

Approximately an hour later, Kara showed up at Kevin's apartment with her dog. They walked toward the same place where Kara had met Appellant earlier that afternoon, and Kevin stayed in the dog park area. Once Kara walked between the buildings, he lost sight of her. When Kara did not return after thirty minutes had elapsed, Kevin tied her dog's leash to the fence at the dog park and went home. After Kevin sent Kara a message and received no response, he returned to the dog park and ran into Kara's mother. Kara's mother asked Kevin where Kara was, and he said that he did not know. He explained that he had lost sight of her when she had walked between the buildings.

Also on June 23, 2019, Officers met with Jane's mother, who told police that she had been out of state during the day on June 19 and had not returned to her apartment until 11:00 p.m. that night,[6] that her husband had left the apartment around 2:00 p.m. that day and had returned at 11:00 p.m., and that they had allowed Appellant to stay in their apartment while they were gone. She said that she had spoken to Appellant around 7:00 p.m. on June 19 and that he had told her that he was leaving with Trent. During the interview, Detective Shelley noticed a trash dumpster next to Jane's apartment.

---

[6]Jane's mom had taken Jane out of state and had left her there for a vacation.

Detective Shelley testified that Appellant's cell phone records showed that he had disconnected from his usual forms of communication at 6:06 p.m. and had re-engaged one hour and eleven minutes later. This was a source of concern because based on "the area [where Kara] was, the time that she went missing, matching up on her cell phone we have the last ping[,][7] and the fact he had access to that apartment[,] and he was [the] only one there."

On June 24, 2017, the crime scene unit utilized a chemical called Blue Star reactive spray to assist with locating areas contaminated with traces of blood. They sprayed the dumpsters at the apartment complex, the backside of Jane's patio, and the patio railing. The spray revealed places on Jane's patio railing that were consistent with human blood.

The following day, Detective Shelley conducted a search of Jane's apartment and located small areas that appeared to contain blood drops, including on the door of the bedroom where Appellant had stayed, on the closet and bathroom door nearby, and on the blinds leading from the apartment to the back patio. During the search, a hammer—which appeared to have blood drops on the steel head—was found on top of Jane's dresser. The crime scene technicians used the Blue Star reactive spray on the bathroom, which revealed blood smears and splatter on the side of the bathtub, the two faucet handles, and

[7]The cell phone records showed that the last time Appellant's phone pinged off the same tower as Kara's phone was 7:41 p.m. Approximately six minutes later, Appellant's phone reflected that it was headed toward North Richland Hills, which was consistent with Appellant's testimony that he had left the Bedford apartment complex with Trent to head back to Fort Worth.

the soap dish. After processing the scene at the apartment that day, officers observed what appeared to be a trail: there were smear marks from Jane's bedroom leading into the hallway and into the bathroom, then leading back out of the bathroom, down the hallway toward the kitchen area, and ultimately to the back patio sliding glass door. Officers collected blood samples from the patio railing at Jane's apartment, and those blood samples tested positive for Kara's blood.

On June 27, 2017, Detective Shelley interviewed Appellant a second time. Appellant said that he had stayed at Jane's apartment for the week preceding June 19 and that he had seen Kara with a white male who was missing his front teeth and who was supposed to make dabs with Kara.[8] Appellant explained that he served as the middle man for Kara and a man named David; Appellant bought marijuana from David and then sold the marijuana to Kara. Appellant said that on June 19, he was going to sell ten grams of marijuana to Kara for $100. Appellant went by Kara's apartment but saw only Kevin and his younger brother; Kara did not show up for their meeting. On Appellant's way back to Jane's apartment, Appellant saw his friend Candice and smoked marijuana with her before returning to Jane's apartment.[9] Appellant told police that Jane's father

_____

[8]Detective Shelley testified that he was never able to substantiate this information.

[9]Officers interviewed Candice, who said that she had seen Appellant earlier in the day on June 19 but that she was at work at a barbecue restaurant at the time when Appellant claimed he had smoked marijuana with her.

8

was at the apartment with him until five minutes before Trent picked up Appellant.

On June 28, 2017, Detective Shelley spoke with Jane on the phone because she was still out of state. Jane said that she had met Kara on one occasion at the apartment complex but that Kara had never been inside Jane's apartment. Jane told Detective Shelley that she was talking to Appellant on the phone on June 19 when he told her that he had to go meet Kara at the dog park. Jane understood that Appellant was going to give Kara more marijuana so that she could make dabs for him. Jane talked to Appellant around 5:00 p.m. on June 19, and he told her that Kara never showed up, that he walked around looking for her but never found her, and that he saw Kara's mother and Kevin at the dog park.[10]

On August 3, 2017, officers executed a search warrant at Trent's house and seized an Iphone and a letter that was located next to Appellant. Detective Shelley testified that the letter "reads as if it's a letter to someone talking about getting time lines correct" in order to establish an alibi.

When officers interviewed Jane in person after she returned from her out-of-state trip, she explained that Appellant was afraid that the police were listening in on his phone calls, so they wrote out questions and answers on paper—the

---

[10]Detective Shelley said that Kara's mother and Kevin were not at the dog park until later that evening.

alleged "letter" that was found—and showed them to each other via FaceTime. Appellant instructed Jane on what to tell the police. Jane expressed that she had been suspicious when Appellant was out of communication for the hour and eleven minutes during the time when Kara went missing, but Appellant told Jane that he could not speak to her during that time because he was smoking marijuana with Candice.

Detective Zachary Hicks with the Bedford Police Department testified that he had obtained records from Instagram showing that Appellant had sent eight messages to Kara between 7:22 p.m. and 7:23 p.m. on June 19: "[t]he first three just seemed to be trying to get her attention; stop playing, your folks are looking for you, answer me, where you at, your mom [is] looking for you, . . . quit playing, go home." Detective Hicks testified that the timing of Appellant's Instagram messages to Kara was noteworthy because no one knew that Kara was missing when Appellant sent those messages and because Kara's phone was shut off at 7:05 p.m. When Kara's mother sent Appellant an Instagram message at 10:58 p.m. telling him to send Kara home, he said that he had gone to meet Kara earlier but that she did not show up; he also mentioned that Jane was with him, despite that she was out of state.

Detective Hicks testified that Appellant's cell phone was seized pursuant to a search warrant and reflected that all phone calls prior to June 22 had been deleted. Appellant also changed his phone number approximately two weeks after Kara's death.

## 2. The Arrest

On August 25, 2017, police issued an arrest warrant for Appellant for Kara's murder. Detective Shelley testified that there was probable cause to issue the arrest warrant because Appellant was seen with Kara on June 19, because the time lines he gave were inconsistent with the time lines given by other people the police had interviewed, because Appellant went silent from the internet for one hour and eleven minutes on the evening of June 19, because Appellant admitted that he had been in Jane's apartment on June 19, because no other adults were present in Jane's apartment during that time, because Kara's blood was found at Jane's apartment, because there was a dumpster near Jane's apartment and debris from that dumpster was traced to the area of the landfill where Kara's body was found, because Appellant tried to use Jane's father and Candice as alibis, and because Appellant deleted from his phone certain messages and calls that took place from June 17 through June 21. Police arrested Appellant on September 1, 2017.

## 3. The Pre-Diagnostic Study and Potential Placement Options

Lenn Ortiz, an intake probation officer with Tarrant County Juvenile Services, testified that he had authored Appellant's pre-diagnostic study, which noted that Appellant had a history of being manipulative, a bad influence on children, and disrespectful to women. The social history stated that Appellant demanded his independence from his mother in February 2017 and that since that time, he had resided in motels, in the laundry room at Jane's apartment

11

complex, or at Trent's house. Appellant said that he had stopped going to school and that he had been working for Trent at an auto glass shop prior to his arrest.

During Ortiz's interview with Appellant, he stated that he had zero drug use because he participated in boxing and was subject to drug testing, but Appellant eventually disclosed that he had used marijuana on numerous occasions. Appellant's criminal history included a referral on July 4, 2016, for assault causing bodily injury; the Juvenile Probation Department disposed of the offense as "supervisory cautioned." On December 10, 2015, Appellant was referred to the Juvenile Probation Department for exhibiting a firearm on campus or a school bus, and that offense was also disposed of as "supervisory cautioned."

The psychological evaluation attached to the pre-diagnostic study noted that Appellant's mother had disclosed that over the previous year, Appellant's grades had dropped, he had cut more classes, and he had exhibited an increase in behavior problems at school—including defiance, talking back to authority, and fighting at school and in the community. The psychological evaluation also reflected numerous references to Appellant's temper. The psychological evaluation stated that Appellant had a history of truancy, physical aggression, and noncompliance, which resulted in arrests and detention. According to the psychiatrist, Appellant "demonstrates a persistent pattern that violates the basic rights of others," including lying and physical aggression.

Ortiz testified that he had consulted with other members of the Juvenile Probation Department about three possible placements for Appellant, but

Appellant was denied admission to all three. On cross-examination, Ortiz testified that Appellant's behavior at the detention center had been rated as "[l]evel one outstanding" but that he had three incidents—two physical altercations and one verbal altercation.

Carnelius Carey, a placement probation officer for Tarrant County Juvenile Services, testified that he had reviewed the placement packet—consisting of the family history, referral history, social history, the pre-diagnostic study, and the psychological evaluation—and that there were no alternative placements for Appellant.

Dr. Jillian Erdberg, Senior Mental Health Clinician at the Giddings State School, testified that if Appellant were kept in the juvenile system, he would ultimately be sent to the Capital Offender Unit at the Giddings State School. Dr. Erdberg opined that in her professional opinion, Appellant would be held more accountable in TJJD than in the adult prison system and that TJJD would be more of a punishment than prison. Dr. Erdberg explained that it would be more of a punishment for Appellant to be sent to TJJD than prison because

> [h]e's going to have to relive that offense on a daily basis. So not only will he have to talk about the offense in group with his case manager, . . . he's going [to] have to do it in group, in Capital Offender group, which is an extremely intensive program. He's not just going to just have to go and forget about it and never talk about it again. He's going to have to talk about it every day and talking about something that -- that severe is stuff that people want to forget[,] and we're not going to let him forget it.

13

Dr. Erdberg testified that the community would benefit if the juvenile court sent Appellant to TJJD before sending him to adult prison because TJJD would rehabilitate him by helping him learn empathy; would teach him coping skills to deal with anger, as well as other skills that he was never taught; and would help mature him.

On cross-examination, Dr. Erdberg admitted that she had not reviewed Appellant's psychological evaluation. Dr. Erdberg agreed that Appellant would not be able to stay at the Giddings State School for the minimum period of confinement (three years) because he was already seventeen years old at the time of the hearing. Dr. Erdberg further agreed that like TJJD, the adult prison system offers educational and therapeutic opportunities, as well as the possibility of rehabilitation.

### C. The Juvenile Court's Findings

After hearing the testimony set forth above, the juvenile court went over each of the statutory factors on the record and concluded that Appellant should be transferred to criminal district court. The juvenile court's order waiving jurisdiction made the following findings:

> The Court finds that the acts alleged in Paragraphs III and IV of the Petition are First[-]Degree Felonies, the acts alleged in Paragraphs V and VI of the Petition are Second[-]Degree Felonies, and the act alleged in Paragraph VII is a Third[-]Degree Felony under the penal laws of the State of Texas if committed by an adult. The Court finds that the offenses alleged in Paragraphs III and IV were against the person of another.

14

The Court finds that there is probable cause to believe that the Respondent committed the offenses alleged in Paragraphs III, IV, V, VI, and VII of the Petition on file in this cause. The Court finds that the Respondent is of sufficient sophistication and maturity to be tried as an adult.

The Court further finds that the likelihood of reasonable rehabilitation of the Respondent by the use of procedures, services, and facilities currently available to the Juvenile Court is low and, after considering all the testimony, diagnostic study, social evaluation, and full investigation, finds that it is contrary to the best interests of the public to retain jurisdiction.

The Court finds that because of the seriousness of the alleged offenses and the background of the Respondent, the welfare of the community requires criminal proceedings.

. . . .

The Court bases its findings on evidence presented by the State in support of its motion regarding the Respondent's actions and conduct as a principal or a party in the commission of the acts alleged in Paragraphs III, IV, V, VI, and VII of the Petition; specifically, the heinous nature of these actions and conduct, the manner in which they were allegedly committed by the Respondent, and the Respondent's alleged conduct of committing the murder of [Kara] and then committing the offense of Tampering with Physical Evidence. The Court finds that the offense of murder is an offense against the person of another.

The Court also bases its findings on evidence presented during the hearing regarding the Respondent's previous history of sophistication and maturity; specifically, the adult-like sophistication demonstrated in the Respondent's living independently as well as the sophistication implicit in the manner in which the Respondent took steps to cover up and hide evidence of the murder of [Kara].

The Court also bases its findings on evidence presented during the hearing that, due to his age and the seriousness of the offenses, there is a low prospect of rehabilitation of the Respondent if left within the Juvenile System. Moreover, the Court finds that the welfare of the community requires transfer to criminal court.

15

The juvenile court concluded its order by waiving jurisdiction, transferring Appellant to the appropriate Tarrant County criminal district court for criminal proceedings, and certifying "said action."

## III. NO ABUSE OF DISCRETION SHOWN

In his sole issue, Appellant argues that the juvenile court abused its discretion by waiving jurisdiction because TJJD would provide sufficient safeguards for the public and "a very high probability of rehabilitation for [him]."

### A. Applicable Law and Standard of Review

The juvenile court may waive its exclusive original jurisdiction and transfer a child to the appropriate district court or criminal district court for criminal proceedings if the following prerequisites are met:

(1) the child is alleged to have violated a penal law of the grade of felony;

(2) the child was:

(A) 14 years of age or older at the time he is alleged to have committed the offense, if the offense is . . . a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; [and]

. . . .

(3) after a full investigation and hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

*Id.* § 54.02(a) (West 2014). In determining whether to waive its exclusive original jurisdiction, the juvenile court shall consider, among other matters, the following:

(1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (2) the sophistication and maturity of the child; (3) the record and previous history of the child; and (4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court. *Id.* § 54.02(f). These are nonexclusive facts that serve to facilitate the juvenile court's balancing of the potential danger to the public posed by the particular juvenile offender with his amenability to treatment. *Moon v. State*, 451 S.W.3d 28, 38 (Tex. Crim. App. 2014). If the juvenile court waives jurisdiction, "it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court, and shall transfer the person to the appropriate court for criminal proceedings." Tex. Fam. Code Ann. § 54.02(h).

In evaluating a juvenile court's decision to waive its jurisdiction, the Texas Court of Criminal Appeals has instructed us to

> review the juvenile court's ultimate waiver decision under an abuse[-]of[-]discretion standard. That is to say, in deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged and/or the background of the juvenile called for criminal proceedings for the welfare of the community, the appellate court should simply ask, in light of its own analysis of the sufficiency of the evidence to support the [s]ection 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. In other words, was its transfer decision essentially arbitrary, given the evidence upon which it was based, or did it represent a reasonably principled application of the legislative criteria? And, of course, reviewing courts should bear in mind that not every [s]ection 54.02(f) factor must weigh in

17

> favor of transfer to justify the juvenile court's discretionary decision to waive its jurisdiction.

*Moon*, 451 S.W.3d at 47. Further, we are to measure sufficiency of the evidence to support the juvenile court's stated reasons for transfer by considering the sufficiency of the evidence to support the facts as they are expressly found by the juvenile court in its certified order. *Id.* at 49.

## B. Analysis

Here, Appellant concedes that the juvenile court made the proper findings in its transfer order as required by the Texas Family Code and by *Moon*. His sole argument is that with regard to the fourth consideration under section 54.02(f)—the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court—"the factual evidence introduced at trial clearly established that the juvenile court should have retained jurisdiction because there were sufficient safeguards in place for the public and a very high probability of rehabilitation for [Appellant] by use of procedures, services, and facilities currently available to the juvenile court." *See* Tex. Fam Code Ann. § 54.02(f)(4). Appellant points to Dr. Erdberg's testimony that Appellant would be held accountable for his behaviors in the Capital Offender Group at the Giddings State School and that TJJD would rehabilitate him by helping him learn empathy; would teach him coping skills to deal with anger, as well as other skills that he was never taught; and would help mature him. Appellant, however, ignores Dr.

18

Erdberg's testimony that based on Appellant's age, he would not be able to stay at the Giddings State School for the minimum three-year period of confinement, thus limiting the rehabilitation that TJJD could provide to Appellant, and that the adult prison system offers rehabilitation options similar to those offered through TJJD. Accordingly, the section 54.02(f)(4) consideration, along with the other three unchallenged section 54.02(f) considerations, weighs in favor of a decision to transfer jurisdiction.

We now focus our analysis on whether the juvenile court abused its discretion—i.e., acted without reference to guiding rules or principles—in reaching its decision to waive its jurisdiction and to transfer Appellant to criminal district court. The record reflects that the juvenile court carefully considered this matter. The record from the evidentiary hearing includes crime scene photographs and police officers' testimony, which reveal that Kara suffered a violent death and that great lengths were taken to destroy evidence of her death. The juvenile court also ordered and received a pre-diagnostic study, which detailed the investigation of the current offense, Appellant's prior criminal history, and his substance-abuse history, as well as that three potential juvenile placements for Appellant were denied. Moreover, the transfer order includes the findings specified under section 54.02(f), and each of those findings is sufficiently supported by the evidence. *See id.* § 54.02(f).

On this record and in light of these findings, we cannot say that the juvenile court's decision was arbitrary or made without reference to guiding rules. Rather,

19

the juvenile court's decision resulted from a principled application of legislative criteria. *See Moon*, 451 S.W.3d at 47. Accordingly, we find no abuse of discretion in the juvenile court's decision to waive jurisdiction and to transfer Appellant to criminal district court. *See In re G.B.*, 524 S.W.3d 906, 920–21 (Tex. App.—Fort Worth 2017, no pet.) (holding that juvenile court did not abuse its discretion by waiving jurisdiction and transferring appellant to criminal district court); *In re C.M.M.*, 503 S.W.3d 692, 709–10 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (same). We overrule Appellant's sole issue.

## IV. CONCLUSION

Having overruled Appellant's sole issue, we affirm the juvenile court's order waiving its jurisdiction and transferring Appellant to criminal district court.

PER CURIAM

PANEL: WALKER, GABRIEL, and KERR, JJ.

DELIVERED: April 12, 2018