

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00200-CV

_____

IN THE MATTER OF T.L.

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-110598-19

Before Gabriel, Kerr, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

This is an appeal from the juvenile court's order transferring appellant T.L. (Tom)[1] to an appropriate district court or criminal district court (criminal court) to be tried as an adult.[2] In a single issue, Tom argues that the juvenile court's decision to transfer him to a criminal court was an abuse of discretion. We disagree and will affirm the juvenile court's transfer order.

## II. BACKGROUND

The evidence presented at the May 29, 2019 transfer hearing consisted of testimony from several witnesses and multiple documentary and media exhibits. The evidence developed during the hearing revealed the following facts.

### A. Factual Background

On September 3, 2018, Detective Daniel Koplin of the Fort Worth Police Department began investigating a robbery at a grocery store. Between September 3, 2018 and September 23, 2018, a total of nine robberies involving fifteen victims were committed at seven Fort Worth locations.

---

[1]Throughout this opinion, we use aliases to refer to minors and their family members. *See* Tex. R. App. P. 9.8(c)(2).

[2]The proceeding to declare a juvenile a delinquent under sections 54.03 and 54.04, and the proceeding to waive jurisdiction and to certify a juvenile as an adult for criminal prosecution under section 54.02, are separate and distinct proceedings. *See* Tex. Fam. Code Ann. §§ 54.02, 54.03, 54.04; *Grayless v. State*, 567 S.W.2d 216, 219 (Tex. Crim. App. 1978).

Although some of the robbers attempted to conceal their identities, the surveillance video recordings and witness descriptions indicated that the perpetrators of the nine robberies were young individuals of Asian descent. The recordings also showed that the perpetrators of the nine robberies appeared to be the same four or five individuals based on their height, weight, and clothing and revealed the guns used and backpacks carried during the commission of the robberies.

The robberies appeared to be preplanned and occurred quickly—in a matter of minutes. The robbers were very well-organized, with each seeming to know his exact role. Koplin explained that many convenience stores have a lock in the counter area that the store clerk can activate to prevent the exterior door from opening, and it appeared that the robbers understood this. One robber would open and hold the door to allow two to three others to enter the store with weapons—a gun and a BB gun—and would not allow the door to close during the robbery. Displaying or pointing one or both guns, the robbers would go directly to the store clerks and force them to attempt to remove money out of the cash register. During some robberies, there were as many as four victims, and one of the robbers stole a gold necklace from a store employee during the first robbery. One of the robbers awaited the others in a getaway vehicle located nearby but away from the front of the store. It appeared that the same vehicle was always used. During the last robbery, one of the robbers—not Tom—shot victim Bobby Weeks.

Officers observed that on one surveillance video, two robbers were seen entering the store without any type of mask. After learning that a significant population of persons of Asian descent lived in a particular apartment complex near the robberies, detectives showed still images of the unmasked robbers to the apartment complex's employees. One employee identified a juvenile resident as one of the robbers. Officers spoke with that juvenile at his school, and he implicated Tom as also being involved in the robberies and advised that Tom probably had the guns. Tom also lived in the apartment complex.

Koplin conducted a noncustodial interview of Tom at his school. Tom initially denied any involvement in the robberies, but he eventually admitted that he had held the door during the first robbery at a Texaco, had wielded the BB gun in another instance, and on September 23, 2018—the last robbery date—had driven to one of the robbery locations and had been the getaway driver after the shooting. He was also implicated by other suspects for his role in the robberies.

Detectives obtained search warrants for several locations, including Tom's apartment. During the search of Tom's apartment, officers found items that were consistent with those seen on the surveillance videos—clothing (including the hoodie and shoes that Tom wore during some of the offenses), masks, and backpacks. One of the two backpacks found in Tom's bedroom closet contained a 9mm semiautomatic pistol, and the other backpack contained a long-barrel BB gun. These guns also appeared to match the guns that were seen on the surveillance videos.

After conducting other interviews and observing the surveillance videos, officers determined that Tom had held the door during the first robbery, had held the BB gun during several robberies, and in one of the robberies, had wielded the 9mm semiautomatic pistol—"the real gun." The relevant information for each offense as it relates to Tom is as follows:

(1)     Date:  September 3, 2018
        Business:  Texaco
        Location:  5324 Trail Lake Drive
        Victims:  Robert Moreland and Kapugamage Wickremaratne
        Property:  cash, cigars, tobacco products, gold necklace
        Role:  held door

(2)     Date:  September 9, 2018
        Business:  Ark Grocery
        Location:  1211 Seminary Drive
        Victim: Jesus Aguiniga-Arroyo
        Property:  $2,500, cigarettes, beer, sweet tea
        Role:  wielded BB gun

(3)     Date:  September 9, 2018
        Business:  7-Eleven
        Location:  5300 Sycamore School Road
        Victim:  Phillip Darden
        Property:  $250 cash and Darden's wallet
        Role:  wielded BB gun

(4)     Date:  September 13, 2018
        Business:  Quick Way
        Location:  5375 Granbury Road
        Victims:  Gagan Budhathoki and Tesfahun Anbessie
        Property:  cash
        Role:  wielded handgun

(5)     Date:  September 16, 2018
        Business:  JW Food Store
        Location:  5001 East Berry Street

5

Victims:  Mary Dudley and Roger Carter
Property:  cash and Carter's wallet
Role: participant

(6)  Date:  September 17, 2018
Business:  QuickTrip
Location:  5101 Granbury Road
Victims:  Rodolfo Martinez, Tristan White, and Virginia Ramos
Property:  cash
Role:  wielded BB gun

(7)  Date:  September 19, 2018
Business:  Number One Food Store
Location:  5356 Wedgmont Circle North
Victim:  Surya Pun
Property:  cash and tobacco products
Role: wielded BB gun

(8)  Date:  September 23, 2018
Business:  Texaco
Location:  5324 Trail Lake Drive
Victims:  Robert Moreland and Kapugamage Wickremaratne
Property:  cash
Role: driver

(9)  Date:  September 23, 2018
Business:  Ark Grocery
Location:  1211 West Seminary Drive
Victims: Chiran Rayamajhi, Bobby Weeks (shot during robbery), Andrew Lomba, Rosa Sanchez
Property: not specified
Role: driver

## B.  Procedural History

The State filed a petition in the juvenile court stating in eighteen paragraphs that Tom had committed the offense of aggravated robbery as alleged therein on September 3, 9, 13, 16, 17, 19, and 23, 2018, when he was fifteen years old and

6

requested that the court waive its exclusive jurisdiction and transfer the cause to a criminal court so Tom could be tried as an adult in criminal proceedings. *See* Tex. Family Code Ann. § 54.02(a). Following a hearing, the juvenile court signed a waiver of jurisdiction and order transferring Tom to a criminal court. Tom now appeals the transfer order. *See id.* § 56.01(c)(1)(A) (permitting immediate appeal from an order transferring a juvenile for prosecution as an adult).

## III. DISCUSSION

### A. Applicable Law

The juvenile courts have exclusive original jurisdiction over all proceedings involving persons accused of committing a felony offense between their tenth and seventeenth birthdays. *See id.* §§ 51.02(2), 51.03(a)(1), 51.04(a); *Moon v. State*, 451 S.W.3d 28, 37–38 (Tex. Crim. App. 2014). In certain situations, however, a juvenile court has discretion to waive that jurisdiction and transfer child felony offenders to a criminal court for criminal proceedings. *See* Tex. Fam. Code Ann. § 54.02(a); *Moon*, 451 S.W.3d at 38. As applicable to this case, a juvenile court may exercise that discretion if it finds that

(1) the child is alleged to have violated a penal law of the grade of felony;

(2) the child was:

> (A) 14 years of age or older at the time [of the alleged offense], if the offense is a . . . felony of the first degree, and no adjudication hearing has been conducted concerning that offense; . . .

7

(B) . . . ; and

(3) after a full investigation and a hearing, [it] determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

Tex. Fam. Code Ann. § 54.02(a); *Moon*, 451 S.W.3d at 38. In making these findings, the juvenile court must consider, among other matters,

(1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(2) the sophistication and maturity of the child;

(3) the record and previous history of the child; and

(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

Tex. Fam. Code Ann. § 54.02(f); *Moon*, 451 S.W.3d at 38. These are nonexclusive factors that serve to facilitate the juvenile court's balancing of the potential danger to the public posed by the particular juvenile offender with his amenability to treatment. *Moon*, 451 S.W.3d at 38. If the juvenile court waives jurisdiction, "it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court, and shall transfer the person to [a criminal] court for criminal proceedings . . . ." Tex. Fam. Code Ann. § 54.02(h).

**B. Tom's Issue**

In his sole issue, Tom complains that the juvenile court abused its discretion by waiving its original jurisdiction and transferring his case to a criminal court. He concedes that the court made proper findings under the Texas Family Code and the holding in *Moon* and does not dispute that the State satisfied its burden of proving that probable cause existed to issue an arrest "affidavit." *See Moon*, 451 S.W.3d at 38. However, Tom contends that the juvenile court should have retained jurisdiction because the evidence established the existence of sufficient safeguards for the public and because "a very high probability" existed for his rehabilitation by use of procedures, services, and facilities available to or through the juvenile court. Tom also asserts that the juvenile court was required to balance the probable cause findings with "other factors" set out in the Family Code in determining whether it should waive its original jurisdiction. *See* Tex. Fam. Code Ann. § 54.02(f).

**C. Standard of Review**

In evaluating a juvenile court's decision to waive its jurisdiction under Section 54.02(a), we first review the juvenile court's specific findings of fact regarding the Section 54.02(f) factors under "traditional sufficiency of the evidence review."[3] *See*

---

[3]Because juvenile transfer cases are reviewed under the civil standards of review for legal and factual sufficiency, and because the State's burden in a juvenile transfer proceeding is by a preponderance of the evidence, *see Moon*, 451 S.W.3d at 40, 45–47, when reviewing an assertion that the evidence is factually insufficient to support a finding under section 54.02(f), we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that

9

*Moon*, 451 S.W.3d at 47. In this context, our sufficiency review is limited to the facts that the juvenile court expressly relied upon in its transfer order. *Id.* at 50.

We then review the juvenile court's ultimate waiver decision for an abuse of discretion. *Id.* at 47. That is to say, in deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged or the background of the juvenile or both called for criminal proceedings for the welfare of the community, we simply ask, in light of our own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. *Id.* In other words, was the juvenile court's transfer decision essentially arbitrary, given the evidence upon which it was based, or did it represent a reasonably principled application of the legislative criteria? *Id.* In conducting our review, we bear in mind that not every Section 54.02(f) factor must weigh in favor of transfer to justify the juvenile court's discretionary decision to waive its jurisdiction. *Id.*

## D. Sufficiency Analysis

In its transfer order, the juvenile court states that because of the seriousness of the alleged offenses and Tom's background, the welfare of the community required

---

the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *see In re E.O.*, No. 02-18-00411-CV, 2019 WL 2293181, at *10 (Tex. App.—Fort Worth May 30, 2019, no pet.) (mem. op.).

criminal proceedings, and in making this determination, it considered the four factors set forth in Section 54.02(f). Tex. Fam. Code Ann. § 54.02(f). The juvenile court also announced at the hearing that it had considered the four factors in making its determination. *See id.* We consider each factor in turn.

### 1.     Offenses against a person

Section 54.02(f)(1) requires the juvenile court to consider whether the alleged offenses were against person or property. *Id.* § 54.02(f)(1). The juvenile court found that the alleged offenses were committed against the person of another, and there was probable cause to believe that Tom committed the offenses alleged in the petition. Koplin testified regarding the nine aggravated robberies and identified Tom as a participant in the commission of each alleged offense. Koplin also identified by name fifteen persons against whom the alleged offenses were committed. Tom does not contest these findings and concedes that the juvenile court correctly found the alleged offenses were committed against a person. We conclude that the findings are supported by factually sufficient evidence.

### 2.     Tom's sophistication and maturity

Section 54.02(f)(2) requires the juvenile court to consider the sophistication and maturity of the child. *Id.* § 54.02(f)(2). The juvenile court found that Tom was sixteen years old at the time the acts in the State's petition were alleged to have

11

occurred and is of sufficient sophistication and maturity to be tried as an adult.[4]  In

support of its finding, the juvenile court noted:

> The psychologist who examined [Tom] concluded that, although he appears less sophisticated than his same aged peers, he is equally as mature as his same aged peers, and appears capable of understanding the legal implications surrounding a discretionary transfer motion and assisting his attorney in his defense.  The facts of the offenses themselves weigh towards the sophistication and maturity of [Tom] and his companion actors to carry out a collaborative scheme.  [Tom] and his companions committed multiple robberies of convenience stores over the course of three weeks, from September 3 to September 23, 2018.  Prior to each robbery, [Tom] and his companions planned in advance what role each would play.  In addition to being armed, the robbers donned masks and hoodies to conceal their identities, wore gloves, and brought backpacks to carry stolen money and property.  [Tom] himself participated in these robberies in multiple roles, on one occasion standing at the door and holding it for others who wielded weapons, sometimes playing the role of the getaway driver, sometimes entering the store donning a hood or mask and wielding what appeared to be a gun but which may in fact have been a BB gun, and on one occasion displaying a real firearm.  Moreover, it was [Tom's] apartment where the police found both guns, clothing and masks that were worn during these robberies, and backpacks that were used to carry stolen property from the robbery locations.

Two psychologists evaluated Tom and each issued a written psychological

evaluation that was admitted in evidence without objection at the certification hearing.

The initial evaluation recommended that consideration be given to Tom's and his

caregiver's linguistic and cultural barriers when providing services, that Tom

---

[4]The juvenile court also found that Tom was seventeen years old at the time of the certification hearing and that at the time the waiver and transfer order was signed, he was seventeen years and six months old.

participate in educational services, and if placed in the community, that Tom

participate in organized extracurricular activities such as part-time employment or

sports to associate with positive peers. Although the initial report did not specifically

address Tom's sophistication and maturity, the subsequent psychological evaluation

specified in part:

> It is concluded that [Tom] is not a person with mental retardation or significant mental illness. He appears less sophisticated than but equally as mature as his same aged peers. He appears capable of understanding the legal implications surrounding a discretionary transfer motion and assisting his attorney in his defense. He appears at moderate risk to reoffend. [Tom] would benefit from services afforded through the juvenile justice system such as a well-structured and supervised environment.

Koplin testified regarding the methods and gear used during the nine

aggravated robberies. These included the interchangeable roles the participants

performed, the use of masks and hoodies to conceal their identities, backpacks to

retrieve stolen items and cash, and a BB gun and a real gun. Koplin testified that on

one or more occasions, Tom held a door, wore a hoodie and mask, wielded a gun or a

BB gun, and acted as a getaway driver. Koplin also stated that clothing, masks, guns,

and backpacks that matched those worn or used during the aggravated robberies were

located at Tom's apartment.

Tom does not challenge the juvenile court's findings regarding his

sophistication and maturity and the manner in which he committed the alleged

offenses. Although the psychological evaluations indicate that Tom would benefit

13

from services afforded through the juvenile justice system, the record contains abundant evidence that supports the juvenile court's finding regarding Tom's sophistication and maturity. Considering the evidence under the appropriate standard, we conclude the juvenile court's findings related to Tom's sophistication and maturity are supported by factually sufficient evidence.

### 3. Tom's record and previous history

Section 54.02(f)(3) requires the juvenile court to consider the record and previous history of the child. *Id.* § 54.02(f)(3). Frank Minikon supervised Tom while he was in detention and testified that Tom was a pleasant resident, had demonstrated a single instance of unacceptable behavior, had spent most of his time on level one—the best level—after entering as others do on level two, had no violations, and had done everything asked of him. Minikon confirmed that Tom had no previous referral history to the department.

At the certification hearing, the juvenile court stated, "I'm going to do this having considered all four factors," and explained to Tom,

> I understand you have no history with this Court. And it's not – I have to check off all the boxes. They're all just things I have to consider. Specifically, the reason for this transfer is going to be that I – there is – the severity and protection of the public and the likelihood of rehabilitation within the juvenile system.
>
> Even though the witness said that it's possible for this to be a six to nine month [rehabilitation] program[,] because of how sophisticated this crime was, how much planning there was, how much organization, your attempts to plan it beforehand as well as your attempts to conceal things after hand – after the fact, the factors of even while you were

14

executing the crime, the organization that was involved is – to me not simply a juvenile matter where it's a lack of, you know, kind of thought of consequences, but it was planned out where you were trying to hide what you were doing and get away with what you're doing and after the fact you kept on continuing to do it. That's what gives me the greatest concern on this.

The record-and-previous-history factor is one of the nonexclusive factors that serve to facilitate the juvenile court's balancing of the potential danger to the public posed by the particular juvenile offender with his amenability to treatment. *Id.* § 54.02(f)(3); *Moon*, 451 S.W.3d at 38. In this instance, evidence of Tom's record and previous history, or lack thereof, is not a fact that the juvenile court expressly relied upon in its transfer order, but it was a factor that the juvenile court considered in making its determinations. *Moon*, 451 S.W.3d at 40, 49–50. Tom does not challenge the juvenile court's determinations in relation to the record-and-previous-history factor, and because the juvenile court did not expressly rely upon Tom's record and previous history in its transfer order, it is not within the scope of our sufficiency review on appeal.[5]

---

[5]"[A] reviewing court should measure sufficiency of the evidence to support the juvenile court's stated reasons for transfer by considering the sufficiency of the evidence to support the facts as they are expressly found by the juvenile court in its [transfer] order. The appellate court should *not* be made to rummage through the record for facts that the juvenile court *might* have found, given the evidence developed at the transfer hearing, but did not include in its written transfer order. We therefore hold that, in conducting a review of the sufficiency of the evidence to establish the facts relevant to the Section 54.02(f) factors and any other relevant historical facts, which are meant to inform the juvenile court's discretion whether the seriousness of the offense alleged or the background of the juvenile warrants transfer for the welfare of the community, the appellate court must limit its sufficiency review to the facts that

15

### 4. Protection of the public and likelihood of rehabilitation

Section 54.02(f)(4) requires the juvenile court to consider the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court. *Id.* § 54.02(f)(4). The juvenile court made findings regarding the protection of the public and the likelihood of Tom's rehabilitation. In its transfer order, the juvenile court declared,

> As a result of all of the above, the Court finds that the likelihood of reasonable rehabilitation of [Tom] by the use of procedures, services, and facilities currently available to the Juvenile Court is low. Because of his present age of 17 years and 6 months, [Tom] could only receive service from the Juvenile Probation Department or the Texas Juvenile Justice Department for a maximum of 18 months.
>
> The Court, after considering all the testimony, diagnostic study, social evaluation, and full investigation, finds that it is contrary to the best interests of the public to retain jurisdiction.
>
> The Court finds that because of the seriousness of the alleged offenses and the background of [Tom], the welfare of the community requires criminal proceedings.

Tom challenges these findings.

The juvenile court heard testimony from several witnesses and considered documentary evidence relating to the prospects of adequate protection of the public

---

the juvenile court expressly relied upon, as required to be explicitly set out in the juvenile transfer order under Section 54.02(h)." *Moon*, 451 S.W.3d 49–50. Section 54.02(h) provides in part, "If the juvenile court waives jurisdiction, it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court[.]" Tex. Fam. Code Ann. § 54.02(h).

and the likelihood of Tom's rehabilitation by use of procedures, services, and facilities currently available to the court.

### a. Daniel Koplin's Testimony

In considering this factor, the juvenile court heard Koplin's testimony regarding the nine aggravated robberies committed over the course of twenty days against fifteen victims, one of whom was shot, and Tom's alleged involvement in those offenses in a variety of roles. The court also admitted evidence showing that the guns, some clothing, masks, and backpacks apparently used in the commission of those offenses had been found in Tom's apartment.

### b. Kim Buck's Testimony

The court heard testimony from Tom's witness, Kim Buck, a program specialist for the Determinate Sentenced Offender Department at the Texas Juvenile Justice Department ("TJJD"), a correctional system for juveniles in the state of Texas. Buck explained that if Tom was sent to TJJD, he would not be able to complete his minimum three-year period of confinement, which is based on the violent nature of the alleged offenses, and he would be required to appear before the judge before his nineteenth birthday for a determination regarding placement in the Texas Department of Criminal Justice ("TDCJ"), the adult prison system in Texas. *See* Tex. Hum. Res. Code Ann. § 245.051(c)(2) (providing that a child committed to the department under a determinate sentence for conduct constituting a felony of the first degree may not be released under supervision without approval of the juvenile court that entered the

order of commitment unless the child has served at least three years). Buck also explained that if Tom received a determinate sentence, he would be placed with TJJD for approximately one and one-half years, and he would undergo a battery of tests to determine his treatment needs and the location of his placement. If TJJD determined Tom needed placement in the most intensive violent offender program, he would be assigned to a specific dorm in a facility that is essentially a prison. That program implements an intensive fourteen-hour schedule which could include housekeeping, meals, school, individual counseling, group treatment and therapies, medication, recreation, and showers. Buck noted that the adult prison system is less structured than the correctional system of TJJD. Buck also noted that if a juvenile does not take advantage of TJJD's services and comply with requirements, and "if the evidence is not in the best interest of the community, the welfare of the community," a recommendation would be made to the court that the person be transferred early, or at age nineteen, to TDCJ. Buck emphasized that TJJD is "about retaining the juvenile[s] . . . if they're willing to accept help[.] . . . [B]ut the juvenile has to be willing to accept the help."

Under cross-examination, Buck admitted that there was "just barely" enough time—due to Tom's age—for Tom to complete an intensive TJJD program, which typically is six to nine months long. Buck noted that the timeframe for Tom's successful completion of the program would be tight due to unknowns because the program involves a closed group that starts and ends together, and if some group

18

members are unmotivated, a delay in completion of the program will result. TJJD could not keep Tom past the age of nineteen, and if he did not complete the program, he would not be as ready as TJJD desired to assimilate back into society. Additionally because of his age, Tom would not be able to complete the minimum three-year period of confinement.

### c. Chris Shahan's Testimony

At the hearing, Tom called witness Chris Shahan, the placement supervisor for Tarrant County Juvenile Services ("TCJS"), to testify. Shahan attempts to place juveniles in treatment centers throughout the United States. He explained that no residential programs having contracts with TCJS were willing to accept Tom into their programs based on existing concerns about the seriousness of his alleged offenses and his inability—due to his age—to potentially complete a program. Four programs located in Texas, Arizona, Michigan, and Iowa had denied Tom placement in their facilities. Shahan confirmed that if Tom was adjudicated delinquent in the juvenile system, he could be placed only in TJJD or on home probation.

### d. Frank Minikon's Testimony

As we have noted, Tom's detention supervisor, Minikon, testified that during Tom's six-month detention, he had been "outstanding." Minikon remarked that Tom had remained on level one for approximately 150 of more than 196 days under Minikon's supervision, with only one incidence of unacceptable behavior and a few instances of acceptable behavior, and stated that Tom had no previous adjudications

or referral history with the department. Minikon reported that Tom had been released into the community with an electronic monitor without violation and had done all that was asked of him.

### e. *Donald Baker's Study*

A written prediagnostic study prepared by Tom's probation officer, Donald Baker, was admitted in evidence without objection.[6] In the study, Baker reported that Tom, who was born in Thailand, had a history of violating his parents' curfew but had no reported history of running away or being "kicked out of the home." Tom's parents reported that Tom passed his classes at school and had never been expelled or suspended.

An assessment indicated that Tom believes that school is "encouraging" and that education is valuable. In his study, Baker noted that Tom had denied any gang involvement, that Tom had no electronic monitor violations during probation, and that the matter before the court represented Tom's first delinquent referral to the department. However, Baker stated that Tom had a "history of negative, delinquent associations[,] . . . [and] would benefit from TCAP[7] if ordered to probation" for the

---

[6]Baker did not testify at the hearing.

[7]The acronym "TCAP" is not identified in the record but may refer to Tarrant County Advocate Program. *See In re C.C.B.*, No. 02-08-00379-CV, 2009 WL 2972912, at *4 (Tex. App.—Fort Worth Sept. 17, 2009, no pet.) (mem. op.).

purpose of addressing Tom's lack of respect for property, admiration and emulation of anti-social peers, and deficient skills in dealing with difficult situations.

> f.      *Dr. Parnell Ryan's Evaluation*

Dr. Parnell Ryan, a licensed psychologist, prepared a written psychological evaluation of Tom in February 2019.[8]   Ryan's written evaluation was admitted in evidence without objection at the hearing.

Ryan reported that Tom claimed to have been unaware that his friends were going to commit a robbery until he was shown weapons and was told to hold the door open on September 3, 2018, and he denied that he was a gang member or had been present at or had participated in any other robberies.  Tom indicated that he was in trouble because of his friends, reported feeling guilty, and was worried that "something bad" could happen.  Tom also expressed pride in himself and indicated that others think of him as a person who acts appropriately.  Ryan reported that Tom "seems to have the cognitive abilities to learn self-regulation and adaptive coping skills; however, [Tom] presented himself as coping adequately with life difficulties and perceives himself as a victim of circumstances rather than being introspective and identifying motivations and perceptions which placed himself in risky situations." Ryan recommended that if placed in the community, Tom participate in organized extracurricular activities.  Ryan also recommended that Tom participate in educational

---

[8]Ryan did not testify at the hearing.

services to increase his academic functioning with consideration to be given to his linguistic and cultural barriers when services are provided.

g.     *Dr. Monica Jeter's Evaluation*

Dr. Monica Jeter, a licensed psychologist, prepared a subsequent written psychological evaluation of Tom in May 2019.[9]  Jeter's evaluation was admitted in evidence without objection at the hearing.

Jeter noted that the chronological notes, which included Ryan's evaluation of Tom, indicate that Tom was described as associating with some suspected gang members and antisocial peers and that Tom's school had called his home regarding his failure to attend classes.  Tom stated that he had no friends but also remarked that when he follows his friends, whose names he said he barely knows, "they get [him] in trouble."  Jeter reported that Tom denied membership in a gang or association with gang members, denied a history of stealing, and "relayed no history of gaining financially from engaging in illegal behavior."  Jeter also reported that when asked about weapon ownership, Tom remarked, "I don't own it.  One of my friend's got the gun.  I didn't use it—gun we got caught with—my friend's gun."  Tom reported to Jeter that he had no prior juvenile justice system interaction and stated that his alleged offense was "Robbery.  They say I did a robbery.  That's it."  Regarding the alleged offenses, Tom claimed that he was forced to hold the door; was told that if he stayed

_____

[9]Jeter did not testify at the hearing.

in the car, he would be shot; and was sometimes made to leave his house under threat of his family being hurt. He was also told not to inform his parents or family about the offenses.

Jeter observed that Tom was cooperative but appeared to have poor to fair judgment and impulse control, lacked insight into his behavior, engaged in cognitive distortion of excuses and victim stance, and used the primitive defense mechanisms of denial and rationalization. Tom declared that the best thing for him is being told what to do, that he will learn from his mistakes, that having responsibility is good, and that working is a deterrent to getting in trouble.

Tom completed a risk factor assessment. Tom's high risk factors included frequent association with criminal or antisocial peers, vulnerability due to acculturation, and little or no involvement in prosocial activities and peer groups. His moderate risk factors included "history of child maltreatment, parent/caregiver criminality," poor achievement at school, peer rejection, stress and poor coping, "risk taking/impulsivity," and "low empathy/remorse." Tom was at low risk in many areas including history of violence, history of nonviolent offending, early initiation of violence, negative attitude, substance-use difficulties, anger management problems, poor compliance and "low interest/commitment to school." Tom's protective factors included positive attitude toward intervention and authority, strong commitment to school, and resilient personality traits. His critical factors included peer delinquency,

lack of prosocial involvement, and vulnerability due to acculturation. Tom indicated a desire to be a productive adult who stays out of trouble.

Jeter concluded that Tom appeared to be at moderate risk to reoffend and stated that Tom "would benefit from services afforded through the juvenile justice system such as a well-structured and supervised environment."

### 5. Factually sufficient evidence and the juvenile court's findings

Although there was a recommendation that Tom would benefit from juvenile justice services, and there is some evidence that Tom's behavior in detention had been outstanding and that he had no violations while on home monitoring, there was also evidence that because of his age, Tom would possibly age out before he could complete participation in beneficial programs and that he could not be placed in contracted TJJD residential treatment facilities because of the nature of the aggravated robberies in which he is alleged to have participated. There was also evidence that the nine robberies were sophisticated, well-planned, and repeated over the course of three weeks; that one of the fifteen victims was shot; that the robbers more often than not attempted to conceal their identities; that clothing, masks, backpacks and guns apparently used in the multitude of robberies were found in Tom's apartment; that he admitted—and denied—his involvement in the robberies; and that he participated in the robberies by holding doors, wielding a gun and a BB gun, and acting as a driver.

Considering the evidence under the appropriate standard of review, we conclude the juvenile court's findings regarding the prospects of adequate protection

24

of the public and Tom's likelihood of rehabilitation by use of procedures, services, and facilities currently available to the juvenile court are supported by factually sufficient evidence.

## E. No Abuse of Discretion

Tom's sole basis for his contention that the juvenile court abused its discretion is that its findings under section 54.02(f)(4) were not supported by factually sufficient evidence. *See* Tex. Fam. Code Ann. § 54.02(f)(4). The section 54.02(f) factors "are nonexclusive factors that serve to facilitate the juvenile court's balancing of the potential danger to the public posed by the particular juvenile offender with his or her amenability to treatment." *In re G.B.*, 524 S.W.3d 906, 914 (Tex. App.—Fort Worth 2017, no pet.). The family code does not require the juvenile court to find any particular factor true, which leads us to conclude that these factors are merely nonexclusive guides to assist the court in deciding if the reasons for transfer exist. *In re E.O.*, 2019 WL 2293181 at *10. Yet, as we explained above, we conclude that the evidence relating to these challenged factors weighs in favor of the juvenile court's decision to transfer this case to criminal court.

Additionally, the record shows that the juvenile court carefully considered all the evidence before it and the Section 54.02(f) factors. *See* Tex. Fam. Code Ann. § 54.02(f)(4). It held an extensive hearing, which included testimony from witnesses who were subject to cross-examination. The juvenile court also considered exhibits, which included separate psychological evaluations of Tom. Given the evidence in the

25

record and the specific findings of the juvenile court, we cannot conclude that the juvenile court acted without reference to guiding rules or principles in its decision to transfer the proceedings to criminal court. *See Moon*, 451 S.W.3d at 47. To the contrary, that decision represented a reasonably principled application of the legislative criteria. *See id.* We therefore conclude that the decision was not an abuse of discretion and overrule Tom's sole issue.

## IV. CONCLUSION

Having overruled the sole issue on appeal, we affirm the juvenile court's transfer order.

/s/ Dana Womack

Dana Womack
Justice

Delivered: September 26, 2019

26