

# NUMBER 13-23-00456-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE MATTER OF M.F.M.

On appeal from the 484th District Court
of Cameron County, Texas.

## MEMORANDUM OPINION

**Before Justices Longoria, Silva, and Peña**
**Memorandum Opinion by Justice Silva**

This is an accelerated appeal from the juvenile court's order waiving its jurisdiction

and transferring M.F.M.[1] to criminal district court to stand trial as an adult. By two issues,

M.F.M. argues (1) the juvenile court failed to apply the proper standards in determining

---

[1] We refer to minor children and their families in an appeal related to juvenile proceedings by their initials in order to protect their identity. *See* TEX. R. APP. P. 9.8; TEX. FAM. CODE ANN. § 56.01(j).

whether M.F.M. should be transferred, and (2) the juvenile court improperly admitted evidence at the transfer hearing. We affirm.

## I.    BACKGROUND

On June 12, 2023, the State filed a petition with the juvenile court seeking to transfer sixteen-year-old M.F.M. to criminal district court to stand trial for murder, criminally negligent homicide, murder under the influence of sudden passion, manslaughter, aggravated assault causing serious bodily injury, aggravated assault with a deadly weapon, and deadly conduct by discharging a firearm. *See* TEX. PENAL CODE ANN. §§ 19.02(c), 19.04, 19.05, 22.02(a)(1), 22.02(a)(2), 22.05(b). A transfer hearing was conducted on the State's petition, during which the following evidence was adduced.

### A.    Testimony

Cameron County Sheriff's Office Investigator Karen Naranjo testified she was dispatched in the early morning hours of May 13, 2023, to a residence where an individual, later identified as twenty-three-year-old Alejandro Villarreal, had been shot. There were three witnesses to the shooting: twenty-seven-year-old Julio Antonio Alvarado, twenty-six-year-old Claudia Iveth Chavarria Garcia, and twenty-one-year-old Karla Monserrat Bolanos. Each provided a video statement.

The group, including M.F.M., had spent the prior day at the beach together. Garcia noted that tensions had been high between M.F.M. and Bolanos, who had ended a two-year relationship with M.F.M. two days prior and was now having relations with Villarreal. After the group returned to Alvarado's residence, M.F.M. confronted Villarreal and Bolanos. M.F.M. left the residence on his bicycle following a brief verbal altercation.

2

According to Alvarado and Bolanos, after some unspecified amount of time, while Garcia was in the kitchen and Alvarado, Bolanos, and Villarreal were sitting in the living room watching television, M.F.M. entered the residence and shot Villarreal several times. Bolanos said M.F.M. first shot Villarreal in the leg and then in the chest.

Garcia claimed she heard Villarreal shout, "*No mames, guey! No mames*,"[2] followed by a series of gun shots and witnessed Villarreal collapse on the floor near the front door. Garcia stated M.F.M. threatened before he fled: "*A ustedes tambien se los va a llevar la verga*," which was translated to: "It's going to happen to all of you." Villarreal was declared deceased at the residence.

On the same day an arrest warrant was issued for M.F.M., M.F.M.'s parents, A.M. and Y.T., contacted the sheriff's office to turn M.F.M. over to authorities. Y.T. testified that, upon returning home, M.F.M. immediately admitted to having "killed someone" in self-defense. Y.T. stated, "We talked and he decided that he wanted to call the police to turn himself in."

M.F.M. provided a written statement to Investigator Naranjo. M.F.M. claimed he initially left the gathering to go to Bolanos's residence to pick up her purse as a favor to her.[3] M.F.M. stated he found the handgun inside Bolanos's purse, and he used the handgun to shoot Villarreal in self-defense. M.F.M. inexplicably disposed of the purse before returning to Villarreal's residence. After the shooting, M.F.M. disassembled the

---

[2] The court interpreter provided the following translation: "You're kidding me. You're kidding me."

[3] An arrest warrant for M.F.M. was later issued for a burglary of a habitation with intent to commit a felony after Bolanos's parents reported their home had been burglarized. Bolanos's father told police that he awoke in the middle of the night and discovered the sliding door, kitchen window, and living room window had been opened.

handgun and discarded it in his parent's yard. M.F.M.'s parents later located the disassembled handgun and turned it over to police. A Firearm Trace Summary report named Bolanos as the handgun purchaser.

Investigator Naranjo opined that M.F.M.'s claim of self-defense ran contrary to her observations at the crime scene because no weapons were recovered on or near Villarreal, Villarreal sustained a gunshot wound to his ankle, and "there was some blood by the sofa." Investigator Naranjo testified that the physical evidence was instead consistent with what witnesses had told Investigator Naranjo that they had observed: M.F.M. walked in and shot Villarreal unprovoked while Villarreal was still seated on the couch, Villarreal then stood up and said, "*No mames, guey! No mames*," and M.F.M. shot him several more times before Villarreal collapsed on the floor and M.F.M. fled.

Juvenile probation officer (JPO) Elida Olvera also testified, as did juvenile probation supervisor Gracie Gracia, who stated that the type of offense M.F.M. was alleged to have committed significantly reduced the programs available to him in the juvenile system.

## B.    Written Reports

Prior to the hearing, the juvenile court ordered that the juvenile probation department conduct a home evaluation. The court subsequently ordered the completion of a (1) psychosocial evaluation by Dr. Mario Tovar, (2) psychiatric evaluation by Dr. David Morón, and (3) social evaluation and diagnostic study by juvenile probation. The court ordered written reports were completed, and the juvenile court took judicial notice

4

of the written reports—including supplemental probation reports and a report written by Dana Borremans, a licensed professional counselor—at the transfer hearing.

**1.      Juvenile Probation**

**a.      Home Evaluation**

On May 15, 2023, JPO Olvera met with M.F.M.'s parents to conduct a home evaluation. According to M.F.M.'s mother, Y.T., M.F.M. had been residing with his then-girlfriend, Bolanos since December 2022. Prior to then, M.F.M. lived with his parents and two siblings, 20-year-old A.I.M. and 16-year-old A.M., and A.M.'s infant daughter, at the family's two-bedroom residence.

Y.T. told JPO Olvera that she was unsure when M.F.M. had last attended school. School records obtained by JPO Olvera revealed that M.F.M. stopped attending school three years prior, during his seventh-grade year. When M.F.M. was enrolled, he took special education classes "due to an [i]ntellectual [d]isability."

Y.T. reported M.F.M. had "anger issues," although he "never assaulted or hurt anyone." She also informed JPO Olvera that M.F.M. was previously diagnosed with anxiety, and he was prescribed medication but "he did not take it." Y.T. resorted to hiding M.F.M.'s medication in his food, but he often found it and would "throw it away." JPO Olvera noted, "As per Tropical Texas records, [M.F.M.] was a Tropical Texas client in 2018 and was diagnosed with Unspecified Disruptive, Impulse Control[,] and Unspecified Trauma and stressor." M.F.M.'s case was closed in 2019 "due to inability to locate the family."

Both of M.F.M.'s parents disclosed their felony prison histories but denied any history of drug use or gang affiliation.

### b.    Miscellaneous Reports

According to juvenile probation, since M.F.M.'s detainment, M.F.M. has received three disciplinary reports: for becoming "erratic" after he was unable to watch what he wanted on television; for making "in[]appropriate comments (hand gestures) to another resident in [a] different pod"; and for stealing food from another resident. JPO Olvera noted M.F.M. had also refused to take his prescribed medication on multiple occasions.

Although a social evaluation and diagnostic study by juvenile probation was conducted and the written report was referenced and quoted during the direct and cross examination of JPO Olvera, the written report does not appear in the record on appeal.

### 2.    Dr. Mario Tovar

On May 23, 2023, licensed psychologist Dr. Tovar conducted a psychological evaluation and safety risk assessment of M.F.M. As part of his evaluation, Dr. Tovar administered several tests and explained M.F.M. obtained a nonverbal IQ score in the "[p]oor to [b]elow [a]verage [r]ange," and his scores in word reading, spelling, and math computation suggested the presence of a learning disorder. Nonetheless, Dr. Tovar opined that M.F.M.'s "limitations did not appear to be strong enough to keep him from understanding his charges or his legal situation." For the exception of "some moments when [M.F.M.] appeared to act as a younger child," M.F.M. appeared "to be his stated age, and was oriented to time, place, person, and situation."

Ultimately, Dr. Tovar diagnosed M.F.M. with unspecified disruptive, impulse-control, and conduct disorder; unspecified anxiety disorder; and an attention deficit hyperactivity disorder. Dr. Tovar posited that although M.F.M. denied having symptoms or behaviors consistent with a substance use disorder, it "is possible that he was not completely honest with his responses, and that his substance use is more frequent than reported." Dr. Tovar continued:

> During the evaluation process, [M.F.M.] did not appear to be affected by the events that led him to be admitted to this facility. He did not express regret or remorse for having used a gun against another person. He also was seen guarded and appeared to minimize potential common shortcomings and psychological symptoms.

Dr. Tovar recommended that M.F.M. be referred "to a facility where he can receive long-term treatment and where he can be monitored and reevaluated to determine if his level of risk decreases with such interventions" because the current level of risk for M.F.M. to reoffend is "considered to be high."

### 3. Dr. David Morón

M.F.M. was also evaluated by Dr. Morón, who sought to assess M.F.M.'s current mental status and understanding of the legal proceedings against him. After reviewing M.F.M.'s records and speaking with M.F.M., Dr. Morón determined M.F.M. had a good understanding of the legal proceedings and possessed the capacity to collaborate with his attorney. Dr. Morón opined that M.F.M. is currently presenting symptoms consistent with an adjustment disorder and depression. Dr. Morón noted that Y.T.'s depiction of M.F.M. as someone who gets extremely angry very quickly and M.F.M.'s history of becoming physically aggressive with Bolanos is consistent with an intermittent explosive

7

disorder. Dr. Morón did not see a history or presentation consistent with attention deficit hyperactivity disorder as diagnosed by Dr. Tovar but agreed with Dr. Tovar's diagnosis of an anxiety and specific learning disorder. Dr. Morón confirmed:

> [M.F.M.'s] risk of danger to the community . . . is high. He is alleged to have committed a murder that was planned and required a number of steps including leaving the area, getting a gun, and then coming back. This along with the markedly impaired impulse control that has been evident, puts them at high risk to the community.

With respect to M.F.M.'s prognosis for rehabilitation, Dr. Morón surmised that it was "good" provided that M.F.M. receive therapy on an ongoing basis and attend appointments with a psychiatrist to adjust medications to treat M.F.M.'s anxiety and impaired impulse control disorder.

### 4. Dana Borremans

On August 27, 2023, following evaluations by Dr. Tovar and Dr. Morón, Borremans conducted a behavior health assessment of M.F.M. and provided the following diagnostic impressions of M.F.M.: adjustment disorder with depressed mood, intermittent explosive disorder, victim of non-parental sexual abuse, unspecified anxiety disorder, attention-deficit/hyperactivity disorder, predominately inattentive presentation, specific learning disorder, and borderline intellectual functioning.

Borremans remarked that M.F.M.'s underlying mental health issues likely contributed to his commission of the alleged offenses—which "occurred in the context of alleged emotional, physical, and sexual child abuse." She further opined, "[M.F.M.] is likely to have experienced his girlfriend's infidelity as abandonment." Although M.F.M. denied a history of physical, emotional, psychological abuse or abandonment, Borremans

8

characterized M.F.M.'s relationship with Bolanos as abusive. Borremans pointed to M.F.M.'s disclosures that he began dating Bolanos when he was only fourteen; he dropped out of school because Bolanos was jealous of the girls at school; Bolanos would buy him his clothes; and once a week, they would go to a hotel and have sex. M.F.M. told Borremans that he also briefly lived with Bolanos, and during that time, he was only "allowed" to talk to his parents on the phone. Additionally, M.F.M. reported that after a Facebook-related argument, Bolanos broke his cellphone and scratched his arms to the point of scarring. Borremans noted that Bolanos also previously reported violence in the relationship, claiming that M.F.M. had physically assaulted her and stolen her vehicle.

Borremans recommended that M.F.M. be placed in a "secure facility" with "access to mental health treatment for [M.F.M.'s] anxiety, depression, and impulse control," and stated that M.F.M. would benefit from ongoing psychiatric evaluation, therapy, and monitored compliance with medication.

## C.   Transfer Order

At the conclusion of the transfer hearing, the juvenile court declared it would be taking the matter under advisement and later issued its order waiving its exclusive original jurisdiction and transferring the matter for criminal proceedings in district court. The order stated in relevant part:

> The Court finds that the offenses alleged in the State's Petition for Discretionary Transfer to Adult Criminal Court are of the grade of felony.
>
> The Court finds that no adjudication hearing has been conducted concerning the offenses alleged in the State's Petition . . . .
>
> The Court finds that [M.F.M.] was born on February 8, 2007, and is now 16 years of age or older.

9

The Court finds that [M.F.M.] was under 17 years of age on the date of the alleged offense in 2023.

All parties having announced ready, among others, this Court considered the following matters: (1) whether the alleged offense was against person or property; (2) the sophistication and maturity of [M.F.M.]; (3) the record and previous history of [M.F.M.]; [and] (4) the prospects of adequate protection of the public and the likelihood of rehabilitation of [M.F.M.] by use of procedures, services, and facilities currently available to the juvenile court.

After considering evidence and argument of counsel, this Court finds that the welfare of the community requires criminal proceedings, that there is probable cause to believe that the child committed the offense(s) . . . as alleged in the State's Petition for Discretionary Transfer to Adult Criminal Court, and that this court waive its exclusive, original jurisdiction of this cause . . . .

. . . .

This Court is hereby waiving its exclusive, original jurisdiction for the following reasons:

(1)     [M.F.M.] was 14 years of age or older at the time he is alleged to have committed the offenses of [m]urder, [c]riminal [n]egligent [h]omicide, [m]urder [u]nder [i]nfluence [o]f [s]udden [p]assion, [m]anslaughter, [a]ggravated [a]ssault [causing] [s]erious [b]odily [i]njury, [a]ggravated [a]ssault [w]ith [a] [d]eadly [w]eapon, [a]nd [d]eadly [c]onduct . . . ;

(2)     The sophistication and maturity of [M.F.M.];

(3)     Inadequate protection of the public; and

(4)     The unlikelihood of the rehabilitation of [M.F.M.] by the use of procedures, services, and facilities currently available to the juvenile court.

This accelerated appeal followed.

## II.    EVIDENTIARY STANDARD

By M.F.M.'s first issue, which we construe in part as a challenge to the sufficiency of the evidence, he argues the juvenile court failed to apply the proper standards in determining whether he should be transferred to criminal district court. Specifically, M.F.M. challenges the court's order on the basis that it "does not meet the requirements of *Kent* and *Moon*," and the findings do not adequately address each element of the statute. *See Kent v. United States*, 383 U.S. 541 (1966); *Moon v. State*, 451 S.W.3d 28 (Tex. Crim. App. 2014), overruled by *Ex parte Thomas*, 623 S.W.3d 370 (Tex. Crim. App. 2021); *see also* TEX. FAM. CODE ANN. § 54.02.

### A.    Standard of Review and Applicable Law

A juvenile court may waive its exclusive original jurisdiction and transfer a juvenile case to the appropriate district court for criminal proceedings only if certain statutory and constitutional requirements are met. *Ex parte Thomas*, 623 S.W.3d at 372. Specifically, § 54.02(a) of the Texas Family Code allows a juvenile court to waive its exclusive original jurisdiction and transfer a child to the appropriate district court or criminal district court for criminal proceedings if:

(1)    the child is alleged to have violated a penal law of the grade of felony;

(2)    the child was:

    (A)    14 years of age or older at the time he is alleged to have committed the offense, if the offense is a capital felony, an aggravated controlled substance felony, or a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; . . . and

(3)    after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court

11

committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

TEX. FAM. CODE ANN. § 54.02(a). The statute also sets forth that, in making the determination, the juvenile court shall consider the following factors:

(1)     whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(2)     the sophistication and maturity of the child;

(3)     the record and previous history of the child; and

(4)     the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

*Id.* § 54.02(f).

These factors are non-exclusive and assist the juvenile court in balancing the juvenile offender's potential danger with his "amenability to treatment." *Bell v. State*, 649 S.W.3d 867, 886 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (quoting *In re C.O.*, No. 02-21-00235-CV, 2021 WL 5933796, at *5 (Tex. App.—Fort Worth Dec. 16, 2021, pet. denied) (mem. op.)). "Any combination of these factors may suffice to support a waiver of the juvenile court's exclusive original jurisdiction and not every factor need weigh in favor of transfer to the criminal district court." *Id.* The juvenile court is not required to find that the evidence establishes each factor, nor does it need to consider other factors. *Ex parte Thomas*, 623 S.W.3d at 381 (rejecting *Moon*'s requirement that the trial court enter case-specific fact findings justifying the transfer of jurisdiction); *see also Ex parte N.C.*, No. 13-20-00293-CR, 2021 WL 4995574, at *6 (Tex. App.—Corpus Christi–Edinburg Oct. 28,

12

2021, no pet.) (mem. op.) (concluding the same). The factors are merely guiding elements to determine whether grounds for transfer exist. *In re Bell*, 649 S.W.3d at 887.

We utilize a two-part analysis to review a juvenile court's decision to waive its exclusive original jurisdiction and transfer a case to a criminal district court. *See id.* at 887. First, the court must "review the juvenile court's findings using the traditional evidentiary sufficiency review." *Id.*; *see also In re C.C.C.*, No. 13-21-00371-CV, 2022 WL 710143, at *8 (Tex. App.—Corpus Christi–Edinburg Mar. 10, 2022, no pet.) (mem. op.). "In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the juvenile court's findings and disregard contrary evidence unless a reasonable fact[]finder could not reject it." *In re Bell*, 649 S.W.3d at 887. The evidence is legally sufficient if there is more than a scintilla of evidence to support the findings. *Id.* When conducting a factual-sufficiency review, "we consider all the evidence presented to determine if the juvenile court's findings conflict with the great weight and preponderance of the evidence so as to be clearly wrong or unjust." *Id.*; *see also In re C.C.C.*, 2022 WL 710143, at *8.

Then, if we determine that the juvenile court's findings are supported by legally and factually sufficient evidence, we review the juvenile court's ultimate waiver decision for an abuse of discretion. *In re Bell*, 649 S.W.3d at 887; *see also In re J.T.B.*, No. 13-22-00205-CV, 2022 WL 7708451, at *6 (Tex. App.—Corpus Christi–Edinburg Oct. 13, 2022, no pet.) (mem. op.). A juvenile court abuses its discretion if it acts without reference to any guiding rules and principles. *In re Bell*, 649 S.W.3d at 887; *In re K.H.*, No. 01-22-00816-CV, 2023 WL 5615818, at *6 (Tex. App.—Houston [1st Dist.] Aug. 31, 2023, no

13

pet.); *see also In re C.C.C.*, 2022 WL 710143, at *8. "A juvenile court abuses its discretion when its transfer decision is essentially arbitrary, given the evidence upon which it was based." *In re Bell*, 649 S.W.3d at 887. However, "a waiver decision representing a reasonably principled application of the legislative criteria generally will pass muster under the abuse-of-discretion standard of review." *Id.* (cleaned up). An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence. *In re B.E.E.*, 658 S.W.3d 908, 914 (Tex. App.—El Paso 2022, no pet.).

## C. Analysis

M.F.M. principally argues that the juvenile court's transfer order was deficient because "factors required by [§] 54.02(f) were neglected or ignored by the juvenile judge based on a misapplication of the law assuming not all factors were required and that in a murder case, the factors could not be met because no facilities were available." We disagree; the law is clear: a juvenile court need not include specific facts relating to the decision to transfer nor does the order need to "contain factually-supported, case-specific findings" to constitute a valid waiver order. *Ex parte Thomas*, 623 S.W.3d at 383. "[T]he requirement of case-specific fact-findings to support the reasons for the transfer are not required by the text of the statute or constitutional precedent." *Id.* at 381.

Here, the juvenile court's order followed the requirements of § 54.02. *See* TEX. FAM. CODE ANN. § 54.02(f). The order stated that M.F.M. was under seventeen years old when he committed the alleged felony offenses; no adjudication hearing had occurred; and the juvenile court considered all four factors from § 54.02(f) of the Texas Family Code, namely: that the offense was against a person; that M.F.M. was of sufficient

14

sophistication and maturity; that failure to waive jurisdiction would result in inadequate protection of the public; and that the likelihood of rehabilitation of M.F.M. by the use of procedures, services and facilities currently available through juvenile court is unlikely. Moreover, there exists sufficient evidence and support to each § 54.02(f) finding.[4]

To the first factor, witness testimony uniformly alleged that M.F.M. shot Villarreal, resulting in Villarreal's death—thus, the alleged offense here is against a person, which weighs in favor of transfer. *See id.* § 54.02(f)(1); TEX. PENAL CODE ANN. § 12.04(a) (Classification of Felonies); *In re D.D.C.*, No. 13-22-00239-CV, 2022 WL 11429990, at *9 (Tex. App.—Corpus Christi–Edinburg Oct. 20, 2022, pet. denied) (mem. op.) (concluding the same).

As to the second factor, "[e]vidence that the [juvenile] understands the seriousness of the charge against him as well as the proceedings support a juvenile court's finding that the child's sophistication and maturity weigh in favor of transfer." *In re Bell*, 649 S.W.3d at 893; *see In re K.J.*, 493 S.W.3d 140, 151 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("In assessing maturity and sophistication, courts place weight on whether there is evidence indicating that the juvenile does not know right from wrong."). Dr. Tovar, Dr. Morón, and Borremans each noted that M.F.M. only completed schooling up until the seventh grade, was previously enrolled in special education courses, and found M.F.M. to have a learning disorder. The evaluators nonetheless concluded that M.F.M.'s limitations did not prohibit him from understanding the gravity of his legal situation.

---

[4] In its order waiving jurisdiction, the juvenile court found probable cause to believe that M.F.M. committed the alleged offenses. M.F.M.'s brief contains no challenge to the sufficiency of the juvenile court's probable cause finding.

Additionally, the evaluators individually noted M.F.M.'s various attempts to minimize potential psychological symptoms as well as his culpability in the offense (i.e., burglarizing a home to steal the weapon, claiming self-defense, fleeing after the shooting, and discarding the weapon)—all evidencing M.F.M.'s sophistication. *See In re G.B.*, 524 S.W.3d 906, 920 (Tex. App.—Fort Worth 2017, no pet.) (concluding that the decisions a juvenile made to avoid punishment after committing the offense supported the juvenile court's finding that the child "was sufficiently sophisticated and mature to stand trial as an adult"); *see also In re D.D.C.*, 2022 WL 11429990, at *9 (concluding that although there was evidence of D.D.C.'s limited intellectual abilities and impoverished background, the psychologists who examined D.D.C. concluded D.D.C. nonetheless understood the consequences of his behavior, and such evidence—including D.D.C. fleeing after the shooting—was evidence of sophistication and maturity). We acknowledge that there is evidence both for and against a finding of maturity and sophistication. We do not agree, however, that the evidence of immaturity that M.F.M. points to renders the juvenile court's finding erroneous as legally or factually insufficient. *See In re Bell*, 649 S.W.3d at 893.

With respect to the third factor, which considers a juvenile's history, M.F.M. has no prior juvenile history and had only minor rule infractions while in the juvenile detention facility following the commission of the offense. *See id.* at 895 (considering a juvenile's detention facility record). Though this factor weighs against transfer, a juvenile court "does not abuse its discretion by finding the community's welfare requires transfer due to the seriousness of the crime alone, regardless of the child's background." *McKaine v. State*,

16

170 S.W.3d 285, 291 (Tex. App.—Corpus Christi–Edinburg 2005, no pet.); *see also In re D.D.C.*, 2022 WL 11429990, at *11 (same).

Regarding the fourth factor, the juvenile court found that rehabilitation currently available through juvenile court is unlikely. Despite the testimony regarding M.F.M.'s amenability to treatment, there was testimony indicating that M.F.M. was reluctant to take his prescribed medications, necessitating a heightened level of supervision; and the kind of treatment recommended by the evaluators was unavailable to M.F.M. through the juvenile court. JPO Olvera testified that the county lacked the resources to accommodate a child convicted at the juvenile level for murder, specifically in relation to the intensity of a program and the amount of structure that M.F.M. would require. This is significant given M.F.M.'s intermittent explosive disorder diagnosis, documented displays of physical aggression against others, and Drs. Tovar and Morón's finding that M.F.M.'s risk of reoffending was "high."

Having reviewed the record, we conclude that there is more than a scintilla of proof supporting the juvenile court's findings in favor of its waiver of jurisdiction, and the great weight and preponderance of the evidence is not to the contrary. *See* TEX. FAM. CODE ANN. § 54.02(f); *Ex parte Thomas*, 623 S.W.3d at 383; *In re Bell*, 649 S.W.3d at 893; *In re I.M.*, No. 10-22-00273-CV, 2022 WL 17979530, at *1 (Tex. App.—Waco Dec. 28, 2022, no pet.) (mem. op.) (concluding that a juvenile court did not abuse its discretion in determining transfer was appropriate where I.M. entered the residence of his sister's boyfriend and shot the unarmed boyfriend three times although I.M. had no prior juvenile history). We overrule M.F.M.'s first issue.

### III. EVIDENTIARY RULINGS

By his second issue, M.F.M. challenges the juvenile court's consideration of testimony elicited from the probation officer concerning statements made by M.F.M. during a social study and diagnostic interview. M.F.M. avers the "interrogation violated [his] Fifth and Sixth Amendment" rights.

### A. Standard of Review and Applicable Law

The requirements governing an appeal of a juvenile transfer order are the same as in civil cases generally. *See* TEX. FAM. CODE ANN. § 56.01. Unlike in a criminal prosecution, strict rules of evidence are not applied in transfer proceedings "because the juvenile's rights will be fully protected at trial." *In re A.W.*, 661 S.W.3d 547, 554 (Tex. App.—Houston [14th Dist.] 2023, pet. denied); *In re J.S.C.*, 875 S.W.2d 325, 330 (Tex. App.—Corpus Christi–Edinburg 1994, writ dism'd by agr.). Many courts, including this Court, have concluded that a juvenile is likewise unable to assert his constitutional Fifth or Sixth Amendment rights in a juvenile transfer proceeding because such rights are not implicated. *B.R.D. v. State*, 575 S.W.2d 126, 131–32 (Tex. App.—Corpus Christi–Edinburg 1978, writ ref'd n.r.e.) (rejecting appellant's contentions that testimony of a juvenile probation official constituted hearsay or infringed on his Sixth Amendment rights); *see also In re J.B.*, No. 05-23-00973-CV, 2023 WL 8946170, at *3 (Tex. App.—Dallas Dec. 28, 2023, no pet. h.) (mem. op.); *In re A.K.*, No. 02-20-00410-CV, 2021 WL 1803774, at *14 (Tex. App.—Fort Worth May 6, 2021, pet. denied) (mem. op.); *In re H.C.*, No. 02-15-00149-CV, 2016 WL 354297, at *1, n.3 (Tex. App.—Fort Worth Jan. 28, 2016, no pet.) (mem. op.) (collecting cases).

18

Further, to reverse a judgment in a civil case based on error in an evidentiary ruling, an appellant is required to establish not only that the trial court erred, but that the error probably caused the rendition of an improper judgment or prevented proper presentation of the case on appeal. *See* TEX. R. APP. P. 44.1(a). Where evidence is merely cumulative of the testimony provided by the witnesses, any error in excluding the evidence is generally harmless. *See San Pedro Impulsora de Inmuebles Especiales, S.A. de C.V. v. Villarreal*, 330 S.W.3d 27, 44 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.); *see also In re Z.T.*, No. 05-21-00138-CV, 2021 WL 3645103, at *11 (Tex. App.—Dallas Aug. 17, 2021, pet. denied) (mem. op.).

## B. Analysis

Several statements made by M.F.M. to probation were elicited at the transfer hearing through JPO Olvera's testimony,[5] namely, that he: acted in self-defense, provided conflicting information about his relationship with Bolanos, and admitted his father was a gang member. M.F.M. argues that "[d]isparaging characterizations" were also taken from his "interrogation," such as, "He was asked what type of activities he enjoyed with his friends. He smirked, and he stated that he did not do anything." M.F.M. additionally asserts that his statements were "used against him to argue lack of remorse" and show his sophistication and maturity.

Assuming without deciding that M.F.M. preserved each challenged evidentiary ruling and the juvenile court erred in admitting the testimony, *cf. B. R. D.*, 575 S.W.2d at

---

[5] Though multiple reports by juvenile probation appear in the clerk's record, there exists no report containing statements made by M.F.M. to probation. However, neither party disputes that a meeting between M.F.M. and juvenile probation occurred, wherein these statements were obtained.

131–32, the testimony was cumulative of other evidence before the juvenile court. *See Villarreal*, 330 S.W.3d at 44. M.F.M. told law enforcement and each of his evaluators that he acted in self-defense; more than one evaluator noted that M.F.M. provided conflicting statements regarding his relationship with Bolanos; and he also told Borremans about his father's gang membership. In this instance, any error in eliciting such information from JPO Olvera where the information was elsewhere admitted absent objection renders the objected-to evidence harmless. *See id.* We overrule M.F.M.'s second issue.

## IV. CONCLUSION

We affirm the juvenile court's order waiving jurisdiction.

CLARISSA SILVA
Justice

Delivered and filed on the
8th day of February, 2024.